# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

LISA A. HOUSE,

     Plaintiff,

v.

                                     Civil Action No. l:17-cv-220

UNUM LIFE INSURANCE COMPANY OF
AMERICA, and UNUM GROUP CORP.,

     Defendant.

---

## PLAINTIFF'S CONSOLIDATED MEMORANDUM IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT AND HER RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Oral Argument Requested

Hudson T. Ellis (#028330)
Audrey C. Dolmovich (#035972)
414 McCallie Avenue
Chattanooga,  TN  37402
(423) 634-2506
FAX:  (423) 634-2505
ellish@buchanandisability.com
adolmovich@buchanandisability.com

# I. TABLE OF CONTENTS

I. Table of contents ............................................................................................................ i

II. Introduction .................................................................................................................. 1

III. Statement of Relevant Facts....................................................................................... 1

   A. Underlying Facts Related to the Claim and Unum's Mandated Medical Examination
.......................................................................................................................................... 1

   B. The Language of the Insurance Policy at Issue......................................................... 6

   C. Unum's Internal Policies and Procedures Regarding a Claimant's Recording or
   Being Accompanied by a Witness to a Medical Examinations ................................. 7

   D. Unum's Concerns with Recording an Examination and Related Facts .................... 8

   E. Unum's Understanding and Acknowledgment of Plaintiff's Concerns with Being
   Examined without a Witness or Recording ............................................................... 9

IV. Law and Argument ...................................................................................................... 9

   A. Standard of Review for Summary Judgment and the Applicable ERISA  Standard of
   Review ...................................................................................................................... 9

   B. The Policy is Unambiguous in that No Provision Precludes Ms. House from
   Bringing a Witness or Recording the Examination ................................................. 10

   C. There is Ample Basis for Plaintiff to Request the Attendance of a Witness or a
   Recording of the Examination ................................................................................. 11

      1.   Plaintiff has good cause for wanting a third party witness and a recording of the
         examination based on her interaction with the doctor and the nature of the
         examination.............................................................................................. 11

      2.   Unum's Current and Historical Bad Faith and/or Conflict of Interest Practices
         Weigh in Favor of Allowing Plaintiff to Create a Record as they Give Plaintiff
         Ample Reason to be Concerned about Attending an Examination without Such a
         Record ..................................................................................................... 12

3.    Courts in Kentucky and Across the Nation Recognize that Medical Examinations Ordered and Paid for by an Insurer are Adversarial, Not Independent and Allow a Witness or a Form of Recording.............................. 16

4.    A Recording or an Unobtrusive Witness Would not Interfere with the Examination, and the Doctor's Preference is not Dispositive .......................... 18

5.    ERISA's Unique Procedural Process and Lack of an Ability to Depose or Otherwise Question Hired Medical Examiners Creates an Additional Reason for Allowing ERISA Medical Examinations to be Documented ........................... 19

D. In the Alternative, if the Policy is Found to be Ambiguous, the Doctrine of *Contra Proferentem* Applies .............................................................................. 20

1.    Sixth Circuit Case law supports that Contra Proferentem Applies................... 20

2.    The Doctrine of Contra Proferentem controls under applicable and non-preempted Kentucky State law ...................................................................... 21

3.    Under Sixth Circuit and Non-Preempted Kentucky Insurance Law, the Policy's Ambiguities Should be Read in Ms. House's Favor and Unum Should not be Allowed to Prohibit Her Ability to Create a Record......................................... 22

V. Conclusion ............................................................................................................ 24

## II. INTRODUCTION

Plaintiff asks this court to grant Plaintiff Summary Judgment in regards to her second cause of action under 29 U.S.C. §1132(a)(1)(B) by entering an Order clarifying that, should the Defendant wish to have Ms. House examined, it does not have the right to prevent her from being accompanied by a witness and/or being allowed to record the examination. By granting the requested Order, Plaintiff's first cause of action and Defendants' Counter-Complaint become moot and should be dismissed, as Plaintiff will agree to be examined so long as adequate protections are in place to ensure that the examination is accurately and completely documented.

## III. STATEMENT OF RELEVANT FACTS

### A. Underlying Facts Related to the Claim and Unum's Mandated Medical Examination

Plaintiff is a resident of Lexington, Kentucky, and has been approved for and received disability benefits from Unum since 2001—or over 17 years—as a participant and beneficiary of the long term disability policy Unum issued to her former employer (the "Policy"), Toyota Motor Manufacturing, U.S.A. ("Toyota"). Complaint at ¶ 1, 12, 13, Court Doc. 1. Ms. House's disability is related to her physical condition of impingement syndrome in her right shoulder, as well as cervical segmental dysfunction. ERISA Record, Court doc 17-2, at Page ID# 1105.[1]

On May 23, 2017, Unum informed Ms. House that it would be ordering her to undergo a medical examination with a physician it hired from its "Independent Assessment Network" ("IAN"). ER ID# 263; Declaration of Lisa House, attached as Exhibit A. At that time, Unum did not inform Ms. House that there would be any restrictions to her ability to bring a companion

---

[1] For space saving purposes, references to the ERISA Record, Doc. 17-2, will be to "ER ID#XXX.," where the ID # references the Page ID#.

1

into the examination or to her ability to record the event. House Declaration. On May 31, 2017, Unum sent Ms. House a letter informing her of the examination date, time, location, and the name of physician it had selected. AR 1019-1020. Nowhere in that letter did Unum indicate to Ms. House that she would be unable to bring someone into the exam or record it. AR 1019-1020.

Ms. House was concerned by Unum's decision to require her examination, as her condition had not improved, her treatment had remained consistent (apart from a brief increase in treatment related to an automobile accident in early 2017), her treating physician continued to provide Unum with similar support as before, and Unum had never previously ordered her to be examined in the previous 17 years it had paid her. House Declaration. Ms. House believed that Unum was requiring her examination in order to find a way to deny her claim, rather than as a neutral claim investigation tool, which made her uncomfortable with the examination. House Declaration.

Her concern led her to contact and consult with the undersigned. House Declaration. During that consultation, Ms. House was informed that a former Vice President for Unum's subsidiary had testified that it used tactics like searching for the "right" doctor who would give Unum the answer it wanted.[2] House Declaration. Ms. House was likewise informed that, though there was nothing to prevent Unum from using similar tactics in her case, she could ensure that the examination was accurately documented by bringing a witness and having the examination

_____

[2] Ms. House refers to the testimony of William Feist, who testified in the *Hangarter* case that Unum developed tactics that included searching for the "right physician to do the IME because we want to get the answer we want; we don't want to get the answer that's detrimental to our cause." *Hangarter v. Paul Revere Life Ins. Co.*, 236 F. Supp. 2d 1069, 1085 (N.D. Cal. 2002), aff'd in part, rev'd in part sub nom. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)

2

recorded. House Declaration. She was also informed that Unum had recently granted a similar request based on a policy with almost identical language. House Declaration.

Unum had never previously told Ms. House that she could not bring a witness or record the examination and none of Unum's letters to her prohibited her from doing so. House Declaration. To Ms. House's knowledge, her disability policy did not state that she could not bring a witness or record the examination. House Declaration. Accordingly, given that the examination was with a doctor hired by Unum and would affect the benefits she had received for 17 years and come to rely on, combined with her concern about Unum's motives for the examination, Ms. House decided to attend the examination with a witness and seek to record it. House Declaration.

When Ms. House arrived at the examination location, it was not a normal doctor's office, there were no other examinees in the waiting room and there was a video recording device there. House Declaration. At the examination, Ms. House was informed for the first time that the doctor would not allow her to bring a witness into the examination or obtain a recording of it when the doctor's staff handed Ms. House a form with this information in it. House Declaration; AR 1176. Doctor Harries became agitated when Ms. House requested permission to bring a witness and to record the exam. House Declaration. He said that he was not a movie star, that he did not want to be on video, and that she would be half dressed in the exam and asked her if she really wanted a video of that to be all over the internet. House Declaration. He also told Ms. House that if she did not agree to the examination within 2 minutes, he would report her as having missed her appointment. House Declaration. Ms. House was uncomfortable with Dr. Harries's condescending demeanor and lack of professionalism in their conversation. House Declaration.

3

Additionally, the form warned that providing complete and honest information is important and that "leaving out critical information can be damaging to your case." AR 1176. The form also provided instructions about how to report increases in pain, and the importance of answering questions to the best of her ability and of providing full effort; warning that inconsistent effort "can have a very negative effect on the conclusions of the evaluation." AR 1176. The doctor also threatened Ms. House that if she did not complete the examination with him on that date, she would be cut off from her disability benefits, though he later tempered it to only being "very likely" that she would be denied based on her refusal. House Declaration.

Though Ms. House wanted to comply with Unum's requirement that she attend the examination, she was afraid to be examined without any way of documenting what occurred in the examination. House Declaration. Ms. House knew that she would be under stress and would have difficulty remembering what she was asked and how she responded, as well as what the doctor told her during the examination. House Declaration. She was concerned that, even if the doctor provided a neutral report, if he failed to make note of all she told him, Unum would use that inadvertently left out information to deny her claim. House Declaration.

That being the case, Ms. House left the doctor's office and, shortly thereafter, called Unum to inform it that she was not allowed to bring a witness or record the examination and inquire about the reason for his refusal and to request Unum either ask the doctor to allow the accommodation, or find her an alternate doctor who would. House Declaration; AR at 1171. After initially leaving a message, Unum's Disability Benefit Specialist, Ms. Woodrow, returned her call and discussed the issue, then informed her that she would need to speak with her supervising director and would get back to her. House Declaration; AR 1171.

Rather than speak with her supervisor, Ms. Woodrow spoke to Mr. Oliver Murray, one of Unum's in-house counsel. AR 1172. Further, the only question she posed to Mr. Murray was whether or not the state of Kentucky gave patients the right to videotape evaluations. AR 1172. Mr. Murray indicated in his response that he was not aware of such a law, and added that he reads Unum's policy as giving Unum the opportunity to order an IME, that it does not place conditions on that right, that it does not provide a claimant with the "opportunity to challenge the IME through a 'witness' or with snippets from a recording." AR 1172. Mr. Murray also opines that recordings can be altered or taken out of context. AR 1172. He concludes that she should be informed that she can bring a companion, but that the companion "will be welcome to wait in the facility's waiting room." AR 1172.

When Ms. House asked Ms. Woodrow directly whether Unum could find an alternate physician to perform the examination, Ms. Woodrow told Ms. House that Unum could not ask another doctor to perform the examination. AR 1179. However, the claim file reveals that Unum never attempted to find another physician to perform the examination and that Ms. Woodrow did not ask anyone whether such a request could be granted. See AR generally. At a later date, Ms. Woodrow reports telling Ms. House that "due to EE's location, there are limited physicians;" however, Ms. Woodrow does not report anywhere in the ERISA record the basis for this conclusion and, given that Ms. House lives in Lexington—the second largest city in Kentucky—Ms. Woodrow's statement would appear to have been an off-the-cuff remark not founded in fact. AR 1180.

On June 21, 2017, Unum sent Ms. House a second scheduling letter, informing her that the examination was rescheduled with the same physician at August 11, 2017, and following that

5

letter up with a second that reiterated that the doctor was "not under any obligation to allow you to bring your spouse or to have the examination recorded." AR 1185, 1190.

Because Ms. House continued to be concerned about being examined by Unum's contracted physician without any way to document the event, she retained the undersigned on June 22, 2017 to assist her in requesting that Unum allow her to bring a witness or record the examination. House Declaration. On June 30, now through Counsel, Ms. House wrote to Unum, providing multiple reasons for Ms. House's request, noting that Unum had granted a similar request recently (and specifying the claim number for that case), and asking Unum to reconsider its decision; absent a change in mind, Ms. House asked Unum to provide justification in the Policy for its decision ER at ID# 614-16. Thereafter, Unum and Ms. House traded letters that culminated in establishing that Unum would not allow her to be accompanied or record the examination, and would terminate her benefits if she did not attend the examination. ER at ID# 623-24; 632-34; 641-42; 647-48; 653; 494-95. This lawsuit followed. ER at ID# 665-75

## B. The Language of the Insurance Policy at Issue

The Policy gives Unum the right to have a claimant "examined by a physician […] of its choice." Insurance Policy, Court Doc. 17-1 (the "Policy"), at Page ID# 164. The Policy otherwise does not contain any other instructions, restrictions, or recommendations about how the examination is conducted or what the claimant or doctor can or cannot do at the examination. See, Policy, at Page ID# 142-166.

6

Unum itself, through its designated agent Laura Kilmartin,[3] agrees that the Policy does not state anywhere that Ms. House is not allowed to bring a witness to an examination ordered by Unum. FRCP 30(b)(6) Deposition of Laura Kilmartin, at p. 14-16; relevant excerpts attached as Exhibit B. Further, Unum agrees that the Policy does not state anywhere that Ms. House is not allowed to record or have recorded the examination. Id., at p. 15-16. Unum agrees that there is nothing in the Policy that would inform her whether she is or is not allowed to bring a witness or record the examination. Id., at p. 18-19.

### C. Unum's Internal Policies and Procedures Regarding a Claimant's Recording or Being Accompanied by a Witness to a Medical Examinations

Unum's claims manual does not disallow recording of medical examinations. Claims Manual Portion attached as Exhibit C; Kilmartin Dep., at p. 15, 41-42, 77). The Claims Manual does address a claimant's request to record an examination, admitting at the outset that "[a]n electronic recording of a conversation or IA [i.e., an IME] *can be very convincing evidence*." Claims Manual, at p. 21; see also, Kilmartin Depo., at p. 35-36.

However, Unum cautions that such a recording can be altered and therefore a claimant's initial request should be refused. Id. If the claimant insists, the claims handler should consult with one of Unum's in-house attorneys (or Designated Legal Representatives, "DLR") "to assess the appropriateness of the request and determine next steps.". Id.. at p. 21, 23. The Claims Manual lists as an example that some states have laws providing an insured the right to such a recording, but does not state that this is the only reason why such a request should be granted.

_____

[3] Ms. Laura Kilmartin testified on behalf of Unum as its designated corporate representative. Kilmartin Dep., at p. 8-9. Ms. Kilmartin is a Unum Assistant Vice President, whose primary role at Unum since before 2015 has been creating, supervising, and managing its policies and procedures manual. Id., at p. 10-14.

7

Id., at p. 23.  Unum acknowledges that such requests are granted even when not required by State law.  Kilmartin Dep., at p. 40-41, 71, 81.

Unum makes its own decision about granting or denying a claimant's request to record before advising the potential examining doctor of the request.  Claims Manual, at p. 23 ("If the claimant's request is granted, the potential IA provider will also need to be advised of the request."); Kilmartin Depo., at  p. 69, 70.  Unum confirms that, if it has granted a request to record an examination, but the potential doctor refuses, Unum can choose another doctor. Kilmartin depo., at p. 72-73, 74-75).

Finally, Unum has no written policy at all about allowing or not allowing witnesses in the exam room.  Kilmartin depo., at p. 62-66.

### D. Unum's Concerns with Recording an Examination and Related Facts

The only concern stated in Unum's Claims Manual is its fear that a recording could be altered.  See Claims Manual, at p. 21.  However, Unum agrees that there are a variety of ways Unum can eliminate that risk.  Kilmartin depo., at p. 37, 43-44.

Accordingly, Unum testified to an additional reason for refusing to allow recording or a witness during its deposition; namely, a concern that the recording or witness would "alter the dynamics of the individuals" and indicates that "it is not independent, which is untrue." Id., p. 37.  Unum acknowledges that this rationale is not contained anywhere in the Claims Manual. Id., p. 44-45.

Moreover, Unum agrees that an IME is an unusual examination, in that it is not a typical physician and patient exam.  Id., at p. 29-30, 38-39.  Further, though Unum continually labels the examination as "independent" it acknowledges that Unum is paying for it.  Id., at p. 39, 48, 50.

8

Further, despite Unum's recommendation to its claims handlers to rebuff requests to record by saying the physician's "report, should full document the event," Unum agrees that the examining physician does not include all findings in the report. Kilmartin Depo., at p. 49-50. Unum also agrees that an examining physician can influence the report through which findings he reports. Id., at p. 51-52.

### E. Unum's Understanding and Acknowledgment of Plaintiff's Concerns with Being Examined without a Witness or Recording

In addition to admitting that an examining physician does not report all findings, and decisions about what findings to include can alter the result of the report, Unum agrees that it is possible that an examining physician would attempt to skew the results. Id., at p. 52, 57-58.

Unum acknowledges that claimants would not have the opportunity to make contemporaneous notes while being examined. Id., at p. 45-46, 47-48. Further, a claimant would not have an opportunity to review an examination report for whether it accurately portrayed the examination for many weeks after the examination happened. Id., at p. 53.

Given the possibility that an examining physician would omit or alter a report, Unum tacitly admits that a claimant would have an interest in having an examination recorded. Id., at p. 59-60. Unum further agrees that, as an ERISA fiduciary, it must act in the interest of claimants and should take their interests into account. Id., at p. 61.

### IV. LAW AND ARGUMENT

### A. Standard of Review for Summary Judgment and the Applicable ERISA Standard of Review

The court should grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "The burden is generally on the moving party to show that no genuine issue of

9

material fact exists." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). The evidence is viewed in the light most favorable to the non-moving party. Id.

The policy in force does not grant Unum discretion and therefore the default *de novo* standard of review applies. *Firestone c v. Bruch*, 489 U.S. 101, 115 (1989).

### B. The Policy is Unambiguous in that No Provision Precludes Ms. House from Bringing a Witness or Recording the Examination

The Policy, by Defendant's own admission and a plain reading of its terms, simply does not prohibit Ms. House from bringing a witness or recording an examination ordered by Unum. Def. Br., at p. 5 ("the Policy is silent on the issue of recording an IME"). Instead, Defendants rely on the fact that the policy allows them to choose the physician. On its face, this does not appear to get them to their goal, but they push it further, positing that the physician may decide he will not allow such a record to be made. In that event, they contend that their "absolute and unfettered right to choose a doctor would be foiled." Def. Br., at p. 5-10.

Given that Unum wrote the terms of the policy and could readily have included specific language addressing this issue, expanding the policy's language to create an unstated prohibition is inappropriate. Moreover, Unum itself acknowledges that its standard policy is to grant or deny a request before informing the "potential" physician, and that Unum is capable of finding a different physician if it grants the request but the physician refuses to proceed.

Accordingly, by Unum's own admission, it does not consider its ability to choose a physician one of the factors for whether to grant or deny a request, given that its claims manual contemplates granting or denying the request before selecting the physician.

Given that the Policy unambiguously does not prohibit Ms. House from the relief she seeks, the remaining question is whether Ms. House has a basis for her request. As will be

shown in the section below, Ms. House has abundant and well supported grounds for seeking to have the protection afforded by a witness and a recording.

### C. There is Ample Basis for Plaintiff to Request the Attendance of a Witness or a Recording of the Examination

*1. Plaintiff has good cause for wanting a third party witness and a recording of the examination based on her interaction with the doctor and the nature of the examination.*

As Ms. House explains in her declaration, the doctor selected by Unum was confrontational, unprofessional, and flippant in his interactions with her, causing her to be uncomfortable. Further, the language in his form related to the need for her to be completely accurate and to demonstrate perfect recall or it could be held against her and his threat that her benefits would be terminated if she did not immediately agree to be examined are strong cause for her to want the examination independently documented.

As Unum itself acknowledges, the possibility exists that a doctor could either intentionally or inadvertently adversely influence the testing and his examination report by focusing on certain aspects of the examination, or selectively reporting his findings or the claimant's answers. Unum also admits that Ms. House would not be able to take contemporaneous notes and would not be able to review the examination report for some time after the test concluded. Accordingly, without a witness taking notes or a recording of the examination, Ms. House would be hard pressed to dispute the accuracy or completeness of the doctor's findings, should that be necessary. Accordingly, on this basis alone, Ms. House establishes good cause for her request to have the examination recorded or witnessed.

11

### 2. Unum's Current and Historical Bad Faith and/or Conflict of Interest Practices Weigh in Favor of Allowing Plaintiff to Create a Record as they Give Plaintiff Ample Reason to be Concerned about Attending an Examination without Such a Record

As Ms. House noted being aware of in her declaration, Unum has a history of abusing the medical examination process by searching for the "right" doctor. This practice, testified to by former Unum VP Richard Feist,[4] was part of Unum's attempt to generate income in the claims department through "setting targets and goals for claim terminations to obtain financial gain without respect to claim merit. *Merrick v. Paul Revere Life Ins. Co*., 594 F. Supp. 2d 1168, 1171 (D. Nev. 2008). To summarize, these financial and termination ratio targets created "reserve pressure" in the claim handling teams, incentivizing them to terminate more claims and thereby increase Unum's profitability. Id., at 1172.[5]

The *Merrick* and *Hangarter* cases revealed that, in addition to using medical examinations as weapons to close claims, Unum established closure quotas for its disability claims teams and communicated those goals to the claims handling personnel as well as communicated the approximate value in reserves of each individual claim that claims team was reviewing during that period. Id; *Hangarter*, 236 F. Supp. 2d, at 1085. As result of these and other practices coming to light in the early to mid-2000's, Unum was hit by large punitive damages verdicts in *Hangarter* and *Merrick*. *See Supra*. Additionally, forty-nine (49) State regulators sanctioned and penalized Unum, requiring Unum to follow remedial measures that

---

[4] *See, Hangarter*, 236 F. Supp. 2d, at 1085.

[5] The concepts for how the claims department contributed to Unum's income and or profit is simple and the basics were explained by Unum's former AVP, Anthony Scuderi in his recent deposition. When Unum denies a previously paid claim, that claim closure releases the money set as reserve for the denied claim, and adds (or recovers) that money to Unum's profit column for the month closed. First Deposition of Anthony Scuderi, at p. 26-28; relevant excerpts of deposition attached as Exhibit D. See also, *Merrick*, 594 F. Supp. 2d, at 1172.

12

included signing two regulatory settlement agreements ("RSAs") that included significant corrective actions and pay hefty fines. See, e.g., Unum Regulatory Settlement Agreement, attached as Exhibit E.

Since the underlying events of *Hangarter* and *Merrick* occurred and the RSAs had been put in place, Unum has claimed to have cleaned up its act and eliminated these practices. For instance, Maureen Griffin, one of Unum's former-Vice Presidents ("VP") testified in a 2010 deposition that, when she was elevated to her position as VP, she implemented changes to reduce the culture of "reserve pressure." Griffin deposition, at p. 170; relevant excerpts attached as Exhibit F. One of the primary improvements Ms. Griffin claimed to have made was to remove the access of Unum Assistant Vice Presidents ("AVPs") and Directors[6] to reserve information on Unum's Operational Metrics and Reporting system ("OMAR"). Id., at p. 171. Ms. Griffin testified that even she no longer had access to reserves of open claims and only had access to the reserve amounts of closed claims. Id., at p. 172.

However, even more recently, this firm has discovered that Unum either never stopped, or has returned to the most egregious of its former practices, setting planned termination targets (for both the number of planned claim terminations, as well as the planned aggregate reserve dollar amount recovered) for each claim review team and providing those teams with the reserve amounts for the claimants whose claims are being reviewed. Rather than actually clean up its act

---

[6] Unum's claims structure is as follows: the initial claims handler is a Disability Benefits Specialist ("DBS"); each DBS is supervised by a Director, who also generally supervises 4 to 5 other are DBSs, First Scuderi Depo, at p. 76; each Director is supervised by an AVP, who also usually supervises 4-5 additional Directors, see Id.; the AVP is supervised by a VP, who also supervises additional AVPs, see Id.. The DBS and Director are both heavily involved in reviewing and assessing claims in order to decide whether Unum should deny or continue approving claims under review. Griffin depo, at p. 182-186.

13

as Ms. Griffin testified, Unum simply found ways of concealing the practice. Ironically, Ms. Griffin herself is at the center of Unum's continued reserve pressure

Specifically, in his recent deposition, former AVP Anthony Scuderi confirmed that Unum does not allow its AVPs or Directors to access specific reserve numbers in its OMAR system. Second Deposition of Scuderi, at p. 46; relevant excerpts attached as Exhibit G. However, Mr. Scuderi testified that Maureen Griffin, who was his supervising VP, would provide him with printed sheets of a report labeled a "Change in Status List," that included the names and financial reserve value of claimants each month. Id., at p. 68. He would copy the information in those sheets onto a spreadsheet on his personal computer. Id., at p. 72. He would also receive from Ms. Griffin the aggregate dollar number his team was expected to terminate to meet the "plan" numbers. Second Scuderi Depo., at p. 53. With these figures in hand, he would verbally disseminate that information to the Directors he supervised. First Scuderi depo., at p. 72. After passing the information to his Directors and discussing it with them, that he would shred the paper document he had received from VP Griffin. Id., at p. 72. Thereafter, he would report back to his supervising Vice President periodically on the progress of meeting their "paid recovery" metric. Id., at p. 78. He testified that he believed this was the common practice of all Unum AVPs. See, Id.

Indeed it was Unum's common practice, as Paul Peter, another former AVP of Unum likewise testified that he received the "recovery plan" each month from Maureen Griffin, who was his supervising Vice President as well, and that he passed this information down to the Directors he supervised. Deposition of Paul Peter, at p. 22; relevant excerpts attached as Exhibit H. Paul Peter also testified that he received the Change in Status List that identified a number of claims as potential recoveries for the current month, which list included the names of the

14

claimants and the reserve amount associates with their claim.  See, Id., at p. 41-43.  Paul Peter confirmed that he and the Directors he supervised were graded and held accountable for meeting the "recovery plan" and he impressed upon his Directors the importance of meeting the planned numbers.  See, Id., at p. 29-30.

In a recent deposition by Unum Director Adam Stimson, he testified that he would receive the planned termination numbers from his AVP and write them down so that he could refer to the plan throughout the month.  Deposition of Adam Stimson, at p. 25-30; relevant excerpts attached as Exhibit I.  Moreover, Mr. Stimson testified that he and his AVP discussed multiple times per month the value of claims terminated by his team so far in the period, and where the team stood in relation to the established plan.  Id., at p. 32-33.  Mr. Stimson, confirmed that his meeting the plan numbers was one of his monthly objectives, that it was important for him to try to meet his planned claim termination and dollar reserve amount recovered each month, and that it was pleasing to him to accomplish that objective.  Id., at p. 33-34, 38-39.

As an additional intersection with the specific issues in this case related to Unum's use of hired medical examiners, Mr. Scuderi testified that each time an IME was ordered, that would trigger the claim being put on the Change in Status List.  2d Scuderi depo., at p. 109-110.  Accordingly, when Ms. House's IME was ordered, her claim appeared on the Change in Status List and the reserve amount that Unum would be able to turn into profit if her claim was denied was provided to the Director in charge of her claim, alongside the monthly targets for terminations.  Moreover, beyond merely being listed in the Change in Status Report, Mr. Scuderi testified that claims scheduled for an IME were automatically added to the claims that were projected as closing during the month of that IME.  Second Scuderi Depo., at p. 109-110.

15

Accordingly, despite Unum's protestations of having improved its claim handling practices, in reality, Unum has continued these very same practices, albeit in a concealed manner designed to be much more difficult for investigating litigants or state insurance regulators to discover. Ultimately, Unum continues to engage in the same patterns and practices that the *Hangarter* and *Merrick* cases noted were designed to target claims for closure based on their value, rather than their merit.

These practices—including both Unum's known handpicking of predisposed IME physicians and its targeting of claims based on plan recovery goals related to the value of claims—provide ample cause for Ms. House to be concerned about undergoing a medical examination and grounds for granting her request to have a witness accompany her and have the examination recorded.

### 3. Courts in Kentucky and Across the Nation Recognize that Medical Examinations Ordered and Paid for by an Insurer are Adversarial, Not Independent and Allow a Witness or a Form of Recording Given the Correct Circumstances

To Plaintiff's knowledge, there remains no published federal court of appeals decision has addressed the issue of what conditions can be placed on a medical examination, in an ERISA claim or otherwise. Federal District Courts and State Courts have come to different conclusions on the issue as well enabling Defendant to point to certain cases in their support in their brief. However, Plaintiff contends that the weight of law emanating from the courts that have wrestled with this issue have come out in favor of allowing examinees some form of protection; sometimes as a matter of course, and other times only after good cause for the need is shown.

Among the cases on either side of the issue, one of the most cogent analyses comes from the Kentucky Supreme Court's decision in *Metropolitan Property & Casualty Insurance Company v. Overstreet.* 103 S.W.3d 31, 36 (Ky. 2003). Kentucky's highest court recognized

16

that hired medical examination inherently create the possibility that the examination will be tainted by the adversarial process, noting that "the examining physician will nearly always be hired with an adversarial mind-set." Id., at 38. Further, the Overstreet Court concurred with Unum that "a video record of that examination has the potential to be extremely helpful." Id. at 42-43. Ultimately, the court upheld the plaintiff's right to have the examination videotaped. Id., at 46.

Indeed, state courts have predominantly allowed recording devices or witnesses to attend examinations when faced with the issue. *See e.g., U.S. Sec. Ins. Co. v. Cimino*, 754 So.2d 697, 700–01 (Fla.2000) ("Florida follows a liberal view when determining whether attorneys may attend examinations."); *Jacob v. Chaplin*, 639 N.E.2d 1010, 1013 (Ind.1994) (allowing either party to record "in the absence of some overriding reason to prohibit that recording."); *B.D. v. Carley*, 704 A.2d 979, 981 (App.Div.1998) ("Plaintiff's right to preserve evidence of the nature of the examination, the accuracy of the examiner's notes or recollections, the tones of voice and the like outweigh the examiner's preference that there be no recording device.").

While Federal courts land on both sides of the issue, often depending on the specific facts at issue, federal district courts have regularly allowed an audio recorder, stenographer, or video camera in the examination room. *Sidari v. Orleans Cty.*, 174 F.R.D. 275, 291 (W.D.N.Y.1996) (The Court allowed the audio recording of a mental exam, noting that it was "not persuaded by defendants' argument that the presence of a tape recorder would 'destroy any candor' by the plaintiff and subvert the entire purpose of the examination"); *Di Bari v. Incaica Cia Armadora, S.A.*, 126 F.R.D. 12, 14 (E.D.N.Y.1989) (recognizing that the examination is adversarial and allowing a stenographer); *Zabkowicz v. W. Bend Co.*, 585 F. Supp. 635, 636 (E.D. Wis. 1984)(allowing witness and video camera); *Kuslick v. Roszczewski*, 2012 WL 899355, at *6

17

(E.D. Mich. Mar. 16, 2012)(The court found Plaintiff's request to record the exam reasonable and that the recording would not interfere with the exam, but required Plaintiff to bear the cost of recording."); *Willoughby v. Cribbs*, 2015 WL 12777189, at *1 (S.D. Tex. May 29, 2015)(the Court ordered the examination recorded, noting that "there is no reason plaintiff should have to depend solely on his memory or the report created by defendant's expert as evidence of what transpires at the examination."); *Gade v. State Farm Mut. Auto. Ins. Co*., 2015 WL 12964613, at *4 (D. Vt. Jan. 2, 2015)(the Court granted permission to record, reasoning that "an audio recording to document what transpired will potentially minimize further disputes by the parties or, in the alternative.").

Practically every case that addresses this issue centers on a fact specific analysis. Plaintiff contends that the facts of her case, including her concerns with the doctor and Unum's continued targeting of claims such as hers for termination are sufficient to establish good cause for allowing her the relief she seeks.

### 4. *A Recording or an Unobtrusive Witness Would not Interfere with the Examination, and the Doctor's Preference is not Dispositive*

Plaintiff's requested relief would not fundamentally change the examination and the doctor's preference for not being recorded should be accorded no weight. Reviewing courts have noted that

Specifically, the Supreme Court of Oklahoma recently addressed this issue in its *Boswell v. Schultz* decision, 2007 OK 94, ¶ 18, 175 P.3d 390 (OK 2007). The Court noted that the doctor claimed such a recording would be an invasion of the claimant's privacy, would violate other patient's privacy, and would be annoying and distracting to the doctor. Id., at 399. The Court dismissed these concerns, holding that "[a] defense-selected physician should not have the right

18

to dictate all the terms under which a plaintiff's examination will be held." *See also, Goggins v. State Farm Mut. Auto. Ins. Co*., 2011 WL 1660609 (M.D. Fla. May 3, 2011)(though the hired doctor refused to allow attorney to accompany client in exam, the court ordered that the attorney could attend, noting the adversarial nature of such an exam); *see also, Kuslick v. Roszczewski, supra (*the recording would not interfere with the exam).. *Overstreet*, 103 S.W.3d, at 39–40 (the court found no persuasive reason why the examiner's preference to work unobserved was medically necessary and found "the potential disturbance from a video or audio recorder is minimal"); *Jacob*, 639 N.E.2d, at 1013 ("We also fail to see any reason why electronic recording of the examination would in and of itself impede an examiner's ability to conduct a fair and complete examination"); *State ex rel. Hess v. Henry*, 183 W. Va. 28, 31, 393 S.E.2d 666, 669 (W. Va. 1990)("an unobtrusive device, such as a tape recorder, presents little risk of interference in the physician's examination").

Accordingly, as Ms. House has shown good cause for her need to have the adversarial examination documented, and the recording or witnessing of the examination would not interfere with it, this supports the Court finding that she be allowed the relief she requests.

**5.    *ERISA's Unique Procedural Process and Lack of an Ability to Depose or Otherwise Question Hired Medical Examiners Creates an Additional Reason for Allowing ERISA Medical Examinations to be Documented***

Much of the law cited above is related to situations where Rule 35 examination is at issue, which is only tangentially analogous to the situation before us.  In the ERISA setting, there is even more reason for a complete record to be obtained of the examination.  Given that an ERISA claim is litigated on a closed record, it is even more important for an ERISA claimant to be enabled to create a contemporaneous and complete record of the event.

19

Even Unum acknowledges that a claimant would have no ability to make contemporaneous notes about the questions posed and answers given, or the tests performed and the commentary provided by the doctor during those tests. Further, Unum acknowledges that an ERISA claimant would often be kept from being able to review the doctor's examination report for weeks after the examination occurred, making it even more difficult to attempt to set the record straight even if the opportunity to do so exists. Moreover, unlike a Rule 35 examination, there is no is usually no real opportunity to question the hired medical examiner after the examination or during the litigation.

Accordingly, the only way for a full record of the examination to be included in the court's record (should a court's review be ultimately necessary), is for the examination to be recorded.

### D. In the Alternative, if the Policy is Found to be Ambiguous, the Doctrine of *Contra Proferentem* Applies

Should the court find that the Policy is not unambiguous, in that it could be read to allow an administrator to proscribe a claimant's right to create an independent record by witness or recording, both Sixth Circuit law and non-preempted state insurance law provide that any such ambiguity should be construed against Unum pursuant to the doctrine of *contra proferentem*.

### 1. *Sixth Circuit Case law supports that Contra Proferentem Applies*

While Sixth Circuit law has landed on either side regarding the applicability of the *contra proferentem* doctrine to ERISA claims where the arbitrary and capricious standard applies,[7] the

---

[7] Compare *Copeland Oaks v. Haupt* (209 F.3d 811, 813 (6th Cir. 2000)) and *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, (202 F.3d 839, 847 (6th Cir. 2000)), where the Circuit held "even an arbitrary and capricious standard of review can be tempered [...] construing ambiguities against a plan drafter") with *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d

20

Circuit has been consistent in finding that the doctrine would apply to cases, such as this one, decided under the default *de novo* standard.

Specifically, in its *Mitzel* decision, the Sixth Circuit affirmed that the doctrine of *contra proferentem* would apply when resolving ambiguities in ERISA plan documents. *Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 82 (6th Cir. 2009).

Accordingly, because Unum has not been granted discretion and the *de novo* standard of review applies, Sixth Circuit law provides that this court should resolve any ambiguities in the Policy in Ms. House's favor.

2. ***The Doctrine of Contra Proferentem controls under applicable and non-preempted Kentucky State law***

The Policy lists Kentucky as the governing jurisdiction, as well as the place where it was issued and delivered.  Accordingly, to the degree not preempted by ERISA, the laws of the State of Kentucky control.

The insurance law of Kentucky makes clear that any ambiguity in an insurance contract should be interpreted to be most favorable to the insured. "[I]t is a fundamental rule in the construction of insurance contracts that the contract should be liberally construed and any doubts resolved in favor of the insured." *Davis v. Am. States Ins. Co.*, 562 S.W.2d 653, 655 (Ky. Ct. App. 1977); *see also, Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992).

---

254, 269 (6th Cir. 2018), where the court held *contra proferentum* would not apply to reviewing the administrator's decision under arbitrary and capricious review.

ERISA's black letter law is clear that not all state laws are preempted, providing that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance[…]." 29 U.S.C.A. § 1144. If a state law "regulates insurance," as mandated-benefit laws do, it is not pre-empted. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 746 (1985). The Supreme Court in *Metropolitan* identified three criteria relevant to determining whether a particular practice falls within that Act's reference to the "business of insurance": "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." Id. at, 743.

In *Ward*, the Supreme Court elaborated further, noting that the initial analysis is whether "from a 'common-sense view of the matter,' the contested prescription regulates insurance." *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 359 (1999). Next, if the state law passed that hurdle, a reviewing court should move to the three factors identified in the Supreme Court's Metropolitan Life case listed above. Under this rubric, the Supreme Court ultimately found that a California "notice prejudice" rule founded in that state's common law avoided preemption. *See Id*.

Accordingly, Kentucky insurance law applies and the Policy should be "liberally construed and any doubts resolved" in favor of Ms. House. *Davis*, 562 S.W.2d, at 655.

3.  ***Under Sixth Circuit and Non-Preempted Kentucky Insurance Law, the Policy's Ambiguities Should be Read in Ms. House's Favor and Unum Should not be Allowed to Prohibit Her Ability to Create a Record***

Given that under both Sixth Circuit and Non-Preempted Kentucky Insurance Law, the Policies terms should be read in Ms. House's favor, this court should not read into the policy an

22

absent prohibition from having a witness or taking a recording of the examination. Rather, if the court finds the Policy's terms to be ambiguous in not addressing a claimant's right to document the examination one way or the other, the Court should read that lack of clarity as the Policy allowing such documentation.

In support of their contrary position, Defendants cite to District Court opinions from other Circuits that have no precedential value here. *See, Massachusetts Mutual Life Ins. Co. v. Lanham*, 2005 WL 6157801 (D. Md. Sept. 19, 2005); *Place v. Abbott Labs, Inc*., 938 F.Supp. 1379 (N.D. Ill. 1996); *Erdahl v. Liberty Life Ass. Co. of Boston*, 2013 WL 5838676 (D.R.I. Oct. 30, 2013). Preliminarily, each of these cases is distinguishable as the holdings are fact specific For instance, in both the *Lanham* and *Place* cases, the exam at issue was a psychological exam, which is recognized as much more sensitive to intrusion.

However, more importantly, the relevance of each of the cases is eliminated as none of the cases cited by Defendants were decided under the *contra proferentem* standard. In *Lanham*, the Court specifically noted that "[a]s with other contractual provisions, courts construe the plan's terms without deferring to either party's interpretation." 2005 WL 6157801, at *2. In *Erdahl*, the Court's ruling was even less analogous given that the question before the court was plainly stated as whether Defendant Liberty's refusal was an abuse of discretion. 2013 WL 5838676, at *11. Similarly, the *Place* court's ruling was framed by the arbitrary and capricious standard of review that is inapplicable here. 938 F.Supp., at 1385.

Accordingly, these cases have little value in deciding a case such as the present one under the *de novo* standard as modified by *contra proferentem*. Should the Court find the Policy's terms ambiguous, the Policy's failure to address the right to document the exam one way or the

23

other should be interpreted in favor of Ms. House, who has a clear interest in having the examination independently documented, as acknowledged by Unum.

## V. CONCLUSION

Accordingly, for all the above reasons, Ms. House asks the Court to Grant her Motion for Summary Judgment and deny in turn the Defendants' Motion for Summary Judgment. The Policy is unambiguous in that none of its terms prohibit the Plaintiff's right to independently document the medical examination Defendants ordered and she has specific and definite grounds for requesting this documentation. In the alternative, should the Court find the Policy is ambiguous, that ambiguity should be interpreted in favor of Ms. House under the doctrine of *contra proferentem*, as established by controlling Sixth Circuit law and non-preempted Kentucky insurance law. Ms. House requests that the court schedule oral argument to hear this matter once briefing is completed.

Dated this 27th day of June, 2018.

Respectfully submitted,

ERIC BUCHANAN & ASSOCIATES, PLLC
ATTORNEYS FOR PLAINTIFF

BY:     */s Hudson T. Ellis*
Hudson T. Ellis (#028330)
Audrey C. Dolmovich (#035972)
414 McCallie Avenue
Chattanooga, TN 37402
(423) 634-2506
FAX: (423) 634-2505

24

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2018, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

BY: */s Hudson T. Ellis*
Hudson T. Ellis (#28330)