IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

---

LISA A. HOUSE,                    *
                                  *
          Plaintiff,              *
                                  *
-vs-                              *    NO. 1:17-cv-220
                                  *
UNUM LIFE INSURANCE               *
COMPANY OF AMERICA                *
and UNUM GROUP CORP.,             *     ORIGINAL
                                  *
          Defendants.             *

---

## APRIL 17, 2018

## VIDEOTAPED 30(b)(6)DEPOSITION OF LAURA KILMARTIN

Janet P. Tilley, LCR
Hall & Associates
Post Office Box 428
Chattanooga, Tennessee 37401
(423)267-4328

Case 1:17-cv-00220-HSM-CHS   Document 49-2   Filed 06/27/18   Page 1 of 54   PageID #: 984

APPEARING FOR THE PLAINTIFF:

HUDSON T. ELLIS, ESQUIRE
ERIC BUCHANAN & ASSOCIATES
414 MCCALLIE AVENUE
CHATTANOOGA, TENNESSEE 37402
(423)634-2506

APPEARING FOR THE DEFENDANT:

JAMES T. WILLIAMS, ESQUIRE
TAMRA HARRIS, ESQUIRE
MILLER & MARTIN
832 GEORGIA AVENUE, SUITE 1000
CHATTANOOGA, TENNESSEE 37402
(423)756-6600


VIDEOGRAPHER:

TIM PRAIRIE
AV DIGITAL, LLC
5958 SNOW HILL ROAD, SUITE 144, #150
OOLTEWAH, TENNESSEE 37363
(423)238-9260

1   Q      All right.  Did you have any role in

2   modifying any of the procedures related to recording

3   an IME?

4   A      I don't recall specifically being involved

5   in the modification of that document, of writing any

6   changes to that document.  In the course of being in

7   the policy and procedure organization for ten years,

8   I can't say I never made any revisions to it, but I

9   don't recall any specific revisions I made.

10   Q      Okay.  Well, let's get started with the

11   actual line items.  And we're going to start with

12   number 6, which is "The interpretation of the policy

13   language at issue regarding the scheduling and

14   conducting of IMEs ordered by Unum."

15           This is a copy of the policy, I believe.

16   Would you look at that?

17           (Thereupon, a short pause was had.)

18   BY MR. ELLIS:

19   Q      All right.  Have you reviewed that before

20   today?

21   A      I have, yes.

22   Q      When was that policy written?

23   A      This policy effective date was October of

24   1989.

25   Q      Okay.  And when was it last revised?

```
1   A         I don't -- it appears that it was last --
2   its last anniversary was January 1 of 1998.
3   Q         Okay.  Are you familiar with the terms and
4   the provisions in that policy?
5   A         Yes, I am.
6   Q         Reading through the policy, on any of the
7   pages or in any of the provisions, it does not state
8   anywhere that Ms. House is not allowed to bring a
9   witness to an examination ordered by Unum, does it?
10  A         I don't believe that specific language is
11  in the policy.
12  Q         And in a similar vein, the policy, in its
13  provisions or its terms, does not state anywhere
14  that Ms. House is not allowed to record or have
15  recorded the examination ordered by Unum, does it?
16            MR. WILLIAMS:  Object to the form.
17            Go ahead.
18  A         I don't see those specific words in the
19  policy.
20  Q         There's no words in the policy about
21  having a witness at all, is there?
22  A         The policy speaks to the company's right
23  to order an IME as necessary.  It doesn't speak to
24  the employee specifically.
25  Q         But the question was:  There's no mention
```

1    of whether or not a witness can be brought to an

2    examination at all in the policy, is there?

3    A          I don't believe that specific topic is

4    covered in the policy.

5    Q          And neither is the topic of a recording

6    addressed at all in the policy?

7    A          I don't believe it is.

8    Q          Is it?

9    A          I don't see that.  I don't see that in the

10   policy.

11   Q          Okay.  And Unum wrote that policy,

12   correct?

13   A          Yes.

14   Q          Unum should make sure that the policies it

15   writes are unambiguous, you would agree?

16   A          I believe that the policy cannot speak to

17   every specific situation; so I think to the

18   situations -- you know, a contract, its goal is not

19   to be ambiguous.  However, it can't speak to every

20   specific situation.

21                   MR. WILLIAMS:  And let me interpose

22        an objection.  To the extent you are asking

23        about provisions other than the ones that are

24        at issue in this case, I am going to object

25        that she's not been noticed to present that

1    scheduling and conducting of IMEs ordered by

2    Unum."

3            And to the extent you are asking this

4    witness about other provisions or other aspects

5    of the policy, we object to that testimony

6    being binding on behalf of the company, because

7    that's not what she was noticed here for.

8            To the extent the questions are

9    limited to the topics, she can speak on behalf

10   of the company.

11           MR. ELLIS:  Thank you, James.

12   BY MR. ELLIS:

13   Q         When Ms. House looks at this policy, which

14   is the policy that she is covered under with Unum,

15   is there anything on the face of the policy that

16   will tell her whether or not she can bring a witness

17   to the examination that Unum orders?

18                MR. WILLIAMS:  Object to the form.

19   A         The policy does not have specific language

20   with regard to whether you can bring somebody to

21   the -- to the examination.

22   Q         Okay.  And same question:  If Ms. House is

23   looking at the policy and she is deciding whether or

24   not to bring somebody to record the examination, is

25   there anywhere in the policy that covers her that

 1   tells her whether or not she can have that

 2   examination recorded?

 3               MR. WILLIAMS:  Object to the form.

 4        Objection, asked and answered.

 5   A        This policy provision speaks only to the

 6   company's -- who will pay for the examination and

 7   who has the right to request an examination.  So it

 8   doesn't speak one way or the other to recording the

 9   examination.

10   Q        So the answer to the question, though, is

11   that there's nothing in this policy that would tell

12   her one way or the other whether she can bring a

13   witness or record the examination?

14               MR. WILLIAMS:  Object to the form.

15   A        There is nothing in this -- in this

16   policy, yes.

17               MR. ELLIS:  Then let's move to Item

18        Number 7.  And that's "Defendants' policies,

19        procedures, and/or training materials related

20        to recording and/or witnessing IMEs."

21               (Thereupon, a document was marked
              and subsequently attached hereto as
22              Exhibit No. 3.)

23   BY MR. ELLIS:

24   Q        Would you take a look amount this

25   document?  I will represent to you that these are

1  a second.  Before we get there, I want to ask you:

2  Are there any forms that Unum uses that would relate

3  to a request for the examination to be recorded or

4  witnessed?

5          And by "forms," I'm not trying to trick

6  you here.  The form I'm actually asking you about,

7  or will be asking you about, is the form that Unum

8  sends to the actual doctor who will be performing

9  the examination.

10          Do any of those forms refer to whether or

11  not a claimant can have a recording or a witness?

12  A          I don't know what's stated on the form.

13  The procedure indicates that, if that is permitted,

14  to indicate that in the special-handling section of

15  the form.  So I don't know, without looking at the

16  form specifically, what the form says.

17  Q          Okay.  Is there form language Unum uses to

18  allow a recording or a witnessing of an examination?

19  A          I don't know.

20  Q          Who would know?

21  A          I don't have the form in front of me.  If

22  you -- if you looked at the form online, whether

23  that language is there or is not there, would tell

24  us.

25  Q          It's in a database?

1   Q         Is there a name for that form?

2   A         One section appears to be the IME Process

3   and Privacy Agreement.  I don't know if the entire

4   packet is considered one -- has one title as a form.

5   Q         Okay.  Is it generally sent as a packet,

6   or is it generally sent, you know, one document at a

7   time?

8   A         My basic understanding is that it is sent

9   as a packet.

10  Q         Okay.  Is there anywhere in that packet

11  that says whether or not a claimant is allowed to

12  have a witness or to record the examination?

13  A         I haven't read it in detail.

14            MR. ELLIS:  Sure.  Take your time.

15            (Thereupon, a short pause was had.)

16  A         There's a statement on the process and

17  privacy agreement, number 8, that indicates the IME

18  provider agrees to notify Unum -- to notify the

19  independent assessment network at Unum immediately

20  prior to the IME if video, audio, or other recording

21  methods are to be utilized during the exam.

22  BY MR. ELLIS:

23  Q         Okay.

24  A         On the next page of the same document,

25  Number 4, the IME provider agrees to the following

1   recorded or, you know, physician or -- meetings

2   between physicians and patients are not recorded or

3   do not have witnesses, I don't know that there's any

4   expectation that would be proactively communicated.

5   Q        This is not a usual doctor's appointment,

6   though, is it?

7              MR. WILLIAMS:  Object to the form.

8   A        It is an independent examination, but it

9   is a medical examination between a physician and a

10  patient.

11  Q        But it isn't, though -- right? -- because

12  the form that you send to the doctor specifically

13  says that this is not his patient, correct?

14  A        There is no patient-physician

15  relationship, because it is an independent

16  examination.

17  Q        So, again, this is not a typical "claimant

18  going to see a doctor to be evaluated" type of a

19  situation, is it?

20             MR. WILLIAMS:  Object to the form.

21  A        I -- I believe it's a medical examination.

22  The circumstances as to how they are seeing that

23  particular physician may be different.

24  Q        This is an examination that is

25  specifically related to Unum's investigation about

1    their eligibility for benefits, isn't it?

2                     MR. WILLIAMS:  Object to the form.

3    A          In general, we are -- per our policy, you

4    know, we have the right to examine an -- in an

5    independent manner with an independent physician.

6    Q          But the question was:  The purpose of this

7    examination is to help Unum assess whether somebody

8    should be receiving disability benefits, correct?

9                     MR. WILLIAMS:  I'm going to object to

10        the form.  You're -- again, we're getting off

11        topic here.  We're not talking about recordings

12        and policies related to recordings.

13   Q          You may answer the question.

14   A          Could you repeat the question, please?

15   Q          Sure.  The examination that Unum is asking

16   the claimant to go to is an examination it's going

17   to use to determine whether that claimant is

18   entitled to benefits, correct?

19                     MR. WILLIAMS:  Object to the form.

20        Same objection.  This is not within the topics

21        and not on behalf of the company.

22   A          It is a piece of information that we will

23   use in our -- in our claim administration, yes.

24   Q          That's the purpose of the examination?

25   A          Is to gather information, correct.

1    have the examination witnessed.

2              Would you look at the -- Exhibit 3, the

3    claims manual portions?  What portion of this

4    exhibit refers to requests to have an examination

5    recorded or witnessed?

6    A         The procedure -- procedure titled

7    "Recording Conversations and Independent

8    Assessments."

9    Q         And that's -- looking at the bottom

10   right-hand corner, that starts at page 21?

11   A         Correct.

12   Q         All right.  Is there anything else in the

13   other pages in Exhibit 3 that referred to recording

14   or having an examination witnessed?

15   A         Nothing specific that I'm aware of.

16   Q         Now, Unum says in its claims manual that a

17   recording can be very convincing evidence, correct?

18   A         I'm sorry.  Could you repeat that?

19   Q         At the top of the paragraph -- the first

20   paragraph in the Policy section, it says that "An

21   electronic recording of a conversation or IA" --

22   independent assessment -- "can be very convincing

23   evidence."  Is that right?

24   A         Yes, correct.

25   Q         In what way is a recording convincing

1    evidence?

2    A        Again, assuming -- because the next part

3    goes on to say that it's easy to alter the

4    recording; so, assuming it's an unaltered recording,

5    it -- it shows the specific activities that took

6    place.

7    Q        Okay.  And the activities would include

8    what?

9                MR. WILLIAMS:  Object to the form.

10    A        I don't -- I'm sorry.  Could you be more

11    specific?

12    Q        Well, the activities would include -- you

13    just used a broad term, "the activities."

14    A        So I -- I was referring to the activities

15    of an independent assessment.  So tasks that are

16    done or conversations between the physician and the

17    patient.

18    Q        Okay.  And having a record of that would

19    be convincing how?  What would it convince?

20    A        I think, you know, again, having a

21    electronic recording of a conversation or IA can be

22    convincing evidence as it indicates what occurred at

23    that time.

24    Q        And it would be an exact recording.  It

25    would show what happened rather than just be notes

1  or a summary of what occurred, correct?

2  A          It would, in fact, show what happened when

3  people knew they were being recorded.

4  Q          Okay.  What interest does Unum have in

5  refusing to allow a recording?

6               MR. WILLIAMS:  Object to the form.

7  A          We generally decline the request for a

8  recording for a couple of reasons.  First, as stated

9  here, that there is the possibility that it could be

10 altered.  So we want to be aware of that.

11             Our larger concern is that this is an

12 independent assessment.  This is not a physician

13 employee of Unum.  So this is an independent

14 assessment.  So having the recording in there

15 indicates that there is -- that it is not

16 independent, which is untrue.

17             And, in addition, when two individuals are

18 being recorded, when there's a witness, whenever you

19 introduce kind of a third party, that can alter the

20 dynamics of the individuals.  It could, you know,

21 change the process of what could have happened or

22 what would have happened.  And so there's just a

23 dynamic there of introducing a party into a

24 patient-physician meeting that we -- we decline

25 whenever not allowed to do so by state law,

1    generally.

2    Q        But, again, this is not a -- sorry.

3    A        Generally.

4    Q        Again, this is not a patient-physician

5    meeting, correct?

6    A        It's an independent assessment between a

7    physician and a patient.

8    Q        And a claimant?

9    A        And a claimant.

10   Q        I think we need to be careful about using

11   the word "patient," because it's very specific that

12   the doctor is not entering into a patient-physician

13   relationship, right?

14   A        Correct.

15   Q        Okay.  So we're already, you would agree,

16   introducing an unusual aspect in this

17   claimant-physician relationship, because it's not

18   actually a patient-physician relationship, right?

19   A        It is not a patient-physician

20   relationship, correct.

21   Q        So this is an unusual meeting to begin

22   with, correct?

23            MR. WILLIAMS:  Object to the form.

24   A        Again, an independent assessment is usual

25   in the course of a disability claim assessment.

1    Q          And you keep on using the term

2    "independent."   But Unum is paying for this

3    physician, correct?

4    A          Unum is paying, correct.

5    Q          And this physician is part of Unum's

6    network of physicians that it will refer claimants

7    to be evaluated, correct?

8    A          I don't know that I would agree with --

9    with "Unum's network."   There is -- there is a

10   network of independent physicians that -- it is not

11   affiliated with Unum.

12   Q          Okay.   But that doctor's name is on Unum's

13   list of doctors to send claimants to be evaluated,

14   correct?

15   A          I'm not specifically sure of the process

16   of choosing the independent -- the independent

17   physician.

18   Q          You mentioned that the first reason would

19   be that your -- Unum has a concern that a recording

20   could be altered, correct?

21   A          Correct.

22   Q          There are various ways that Unum could

23   make sure that the video is not altered, correct?

24   A          I don't know.

25   Q          Well, could it hire a professional

1   videographer?

2   A           Unum's process and policy is that we

3   decline the request for recording.  So if we don't

4   want others to record them, we generally do not

5   record them ourselves.

6   Q           Could a claimant have a professional

7   videographer record the session and the videographer

8   attest to the completeness of the record?

9   A           Hypothetically speaking, that -- again,

10  that would be against our policy, which is to

11  decline requests for recording.

12  Q           Generally?

13  A           Generally, yes.

14  Q           So just to be clear, though, Unum does

15  allow recordings of examinations on occasion?

16  A           In specific situations, the most common of

17  which is when state law requires it.

18  Q           But not always, correct?

19  A           I can speak to the high-level policies and

20  procedures that are in place and not any specific

21  claim situations.

22  Q           It would be against Unum's policy and a

23  claims handler would be reprimanded for allowing an

24  examination to be recorded if state law does not

25  require it.  Is that Unum's position?

1        MR. WILLIAMS:  Object to the form.

2    A        I would not go that far.  No.  There --

3    the procedure states that if -- that our first

4    statement is that we would decline the request.  If

5    the claimant insists and wants a recording, then the

6    DBS -- the disability benefits specialist -- would

7    go to their DLR -- their designated legal

8    resource -- to have the conversation.  And, again,

9    things that are considered, such as state law, would

10   be considered.  And then the DLR would look at the

11   specific facts and circumstances of the claim.  And

12   that is the expected process that a DBS would

13   follow.

14   Q        And, certainly, if state law required Unum

15   to allow someone to have a witness or recording, it

16   would do so, correct?

17   A        Correct.

18   Q        But there's nothing in the procedure that

19   says that, absent such a state law, a request like

20   that is categorically denied, is there?

21        MR. WILLIAMS:  Object to the form.

22   A        I think the policy does not state that it

23   is categorically denied.  It states that they should

24   seek legal input and resource.

25   Q        And the legal input and resource could

1    say, "Yes.  We will allow it"?

2    A          They could.  I don't know under the

3    circumstances there -- there are reasons relating

4    back to the specific claim that they would consider.

5    Q          Well, we'll get to that, because that's

6    actually the last topic that you're here to testify

7    about.  We'll wait on that one.

8               But getting back to altering.  You can

9    have a videographer there either at Unum's expense

10   or the claimant's, correct?

11   A          That would be against our overriding

12   policy that we do not record.

13   Q          But outside of the policy, if a

14   professional videographer was there recording, there

15   would not be a concern that the video was altered,

16   would there?

17   A          I don't know.

18   Q          Okay.  You could also request a copy of

19   the entire recording from the claimant if you feel

20   like it has been altered, correct?

21   A          These are all circumstances that could

22   happen if we did not follow our process and the IME

23   was recorded.

24   Q          But you said the process does not exclude

25   the possibility that somebody could have their

1    request granted, correct?

2    A          That are circumstances, as outlined in

3    policy, where that request could be granted.

4    Q          And if they followed those processes and

5    allowed the recording, there are ways that Unum

6    could make sure that the recording, the video or

7    audio, was the full recording, correct?

8    A          Yes, I believe that's correct.

9    Q          Okay.  Including even sending the

10   recording to the doctor to have him review it and

11   say, "Yes.  That is the complete recording."

12   Correct?

13   A          That would address one of the concerns

14   with -- with recording the assessment.

15   Q          Okay.  And, in fact, in an ERISA case,

16   which -- this is an ERISA case, correct?

17   A          I don't know.

18   Q          Okay.  If it were an ERISA case, Unum

19   would have a copy of the recording before it issued

20   a final denial -- well, strike that.

21              Are you familiar with ERISA?

22   A          Yes.

23   Q          When Unum issues a final denial, the

24   record -- the administrative record closes; is that

25   right?

```
 1              MR. WILLIAMS:  Object to the form as
 2        being outside the scope of the topics and not
 3        binding on the company.
 4   Q         And so when Unum issues that denial, the
 5   claimant could not then produce additional evidence
 6   after the fact absent extraordinary circumstances?
 7   A         This is getting to be a very hypothetical
 8   situation.
 9   Q         Well, what I'm trying to get at is that
10   Unum has multiple ways of ensuring that the video
11   that is taken is not altered.
12   A         Is there a question?  I'm sorry.
13   Q         Do you agree that Unum has multiple ways
14   of ensuring that a video that is taken at the time
15   of the examination is not altered?
16   A         I would say there are ways that you have
17   outlined, yes.
18   Q         Okay.  And those would be ways that would
19   be satisfactory to confirm that this is not an
20   altered video-recording?
21   A         That's correct.  And that would address
22   one of the concerns.
23   Q         You mentioned a larger concern, that
24   the -- in your view, the examination is independent,
25   and you believe that it would alter that; is that
```

```
 1   correct?
 2              MR. WILLIAMS:  Object to the form.
 3   A         Yes.
 4   Q         Okay.  Is that mentioned anywhere in this
 5   policy and procedure?
 6   A         I don't believe, specifically, but on
 7   page 22, "Explain the reason for not granting
 8   permission," when it speaks to "It is sufficient for
 9   each party to keep written notes.  An IA is
10   conducted by an independent third party, and their
11   report should fully document the event."  That's
12   additional rationale.
13   Q         In an examination, does a claimant
14   realistically have the opportunity to keep written
15   notes?
16   A         I don't know.
17   Q         So when the doctor is telling the claimant
18   to touch their nose, would the claimant then take a
19   note and say, "We" -- "The doctor asked me to touch
20   my nose here"?
21              MR. WILLIAMS:  Object to the form.
22   A         I don't know.
23   Q         No, correct?  They would not have an
24   opportunity to take contemporaneous notes while
25   being examined by a doctor, correct?
```

1    A         I think it would depend on the examination

2    that was taking place.    Some would be more difficult

3    than others.

4    Q         It would be very odd for somebody to,

5    during the middle of an examination, say, "Hold on,

6    Doctor.    Let me take a note about what you just

7    asked me and what I said"?

8    A         Depending on the examination, it would be

9    more difficult in some circumstances.

10   Q         What examination would that be normal?

11   A         I can't think of anything specifically,

12   sitting here.

13   Q         So a physical examination, that would not

14   be something -- that would be awkward, right?

15   A         As you have outlined it to specifically

16   note every piece of the conversation or every action

17   that's being taken, it would be difficult.

18   Q         Okay.    An examination is generally a

19   stressful event for a claimant, correct?

20             MR. WILLIAMS:    Object to the form.

21   A         I don't know.    I couldn't speak to that.

22   Q         When your insurer, Unum, orders you to go

23   to an examination and that examination is going to

24   determine, to a degree, whether or not your benefits

25   are going to be continued, that would be a stressful

1    event, correct?

2                    MR. WILLIAMS:  Object to the form.

3    A          I don't know.

4    Q          But Unum's position is that a claimant

5    should be sufficiently covered by taking

6    contemporaneous notes of the examination?

7                    MR. WILLIAMS:  Object to the form.

8    A          I don't believe that that is what I stated

9    with regard to contemporaneous notes.  It indicates

10   that the written notes of -- of each party should be

11   sufficient.

12          Actually, if I could go back and clarify

13   my -- my statement, this document refers not only to

14   recording independent assessments but also recording

15   conversations.  And so that would likely be more

16   appropriate when talking about recording telephone

17   conversations, keeping notes from one side of the

18   telephone call to the other.  So that would likely

19   be more appropriate in that conversation rather than

20   independent assessments.

21   Q          And so what would the claimant have to

22   rely on as far as documenting what happened at an

23   examination?

24                    MR. WILLIAMS:  Object to the form.

25          You mean besides the medical report?

```
 1              MR. ELLIS:  I'm asking the witness.
 2   A          The entire nature of the assessment is
 3   that it is an independent assessment.  And so it is
 4   not -- the physician is not conducting that with a
 5   bias toward either the claimant or Unum.  It's an
 6   independent assessment.  So the medical report
 7   should be the -- should be a true -- true statement
 8   of what occurred that the claimant could rely on.
 9   Q          But the physician is being paid by Unum,
10   correct?
11   A          The physician is being paid by Unum.
12   Q          And the physician is a doctor that is in
13   the network of Unum for doctors to send claimants to
14   for an examination, correct?
15              MR. WILLIAMS:  Objection.  Asked and
16       answered.
17   A          I think that you are mischaracterizing the
18   network as being in some way affiliated with Unum
19   rather than a network of physicians who conduct
20   independent medical examinations.
21   Q          Unum has the doctor's phone number and
22   uses it to call this doctor and schedule independent
23   examinations with that doctor on occasion?
24   A          I don't know specifically how it's done.
25   But, yes, they would contact the physician to
```

```
 1              MR. ELLIS:  I'm asking the witness.
 2   A          The entire nature of the assessment is
 3   that it is an independent assessment.  And so it is
 4   not -- the physician is not conducting that with a
 5   bias toward either the claimant or Unum.  It's an
 6   independent assessment.  So the medical report
 7   should be the -- should be a true -- true statement
 8   of what occurred that the claimant could rely on.
 9   Q          But the physician is being paid by Unum,
10   correct?
11   A          The physician is being paid by Unum.
12   Q          And the physician is a doctor that is in
13   the network of Unum for doctors to send claimants to
14   for an examination, correct?
15              MR. WILLIAMS:  Objection.  Asked and
16        answered.
17   A          I think that you are mischaracterizing the
18   network as being in some way affiliated with Unum
19   rather than a network of physicians who conduct
20   independent medical examinations.
21   Q          Unum has the doctor's phone number and
22   uses it to call this doctor and schedule independent
23   examinations with that doctor on occasion?
24   A          I don't know specifically how it's done.
25   But, yes, they would contact the physician to
```

```
 1   schedule an independent medical exam.
 2   Q          You also mentioned that the report of the
 3   physician that Unum hired would fully document the
 4   event.  "Fully document the event" is a very -- very
 5   large term.  Does the doctor document every event
 6   that happened at the examination?
 7                  MR. WILLIAMS:  Object to the form.
 8   A          The -- I what intended to say was that the
 9   medical report, or the report at the end of the IME,
10   answers the questions asked and indicates the
11   independent physician's medical judgment and
12   assessment.
13   Q          And -- sorry.  You weren't done.
14   A          So not every specific situation, yes.
15   Q          So there are going to be findings that are
16   not reported on the examination report?
17                  MR. WILLIAMS:  Object to the form.
18   Q          Correct?
19   A          I don't know what -- what relevant -- all
20   relevant findings should be included within the
21   report.
22   Q          And the doctor is the one who is
23   determining what the relevant findings are, correct?
24   A          In most circumstances, yes.
25   Q          Okay.  So the report does not fully
```

1  document everything that occurred during the

2  examination, then?

3          MR. WILLIAMS:  Object to the form.

4  A       My understanding is that the -- the -- the

5  report does not document every single moment of the

6  examination.

7  Q       And not every finding either, correct?

8  A       I don't know.

9  Q       Okay.  Unum is the party that has asked

10 the doctor to perform specific examinations and

11 answer specific questions, correct?

12 A       Correct.

13 Q       Okay.  And Unum is the entity that is

14 paying the benefit to the claimant, correct?

15 A       Correct.

16 Q       And if the examination finding returns a

17 report that supports a denial by Unum, Unum could

18 stop paying the benefit, correct?

19 A       Unum uses an independent assessment as one

20 piece of information to determine whether or not

21 benefits are owed under the contract.

22 Q       But if the report supported a denial of

23 benefits and Unum denied the claim, Unum would no

24 longer be paying that benefit, correct?

25 A       I would say that the -- a denial of a

1   claim, again, is a contractual determination.  The

2   IME is medical information that would go into that

3   decision.  But if information from the IME supported

4   that benefits were no longer contractually owed,

5   that -- yes, Unum would go through its appropriate

6   process to deny benefits on that claim, however

7   circumstances based on the claim being appropriate.

8   Q          You would agree that a doctor's choice of

9   what findings to include in a report and what

10  findings to not include in a report could have an

11  impact on the findings -- the ultimate findings of

12  the report, correct?

13             MR. WILLIAMS:  Object to the form.

14  A          I -- I do not know.

15  Q          I mean, it's a simple question.  If a

16  doctor chooses to omit positive findings that would

17  support the claim and instead only report the

18  negative findings that would support a denial of a

19  claim, that would have an impact of the IME report,

20  correct?

21             MR. WILLIAMS:  Object to the form.

22  A          While that would have an impact on the

23  report, as this is an independent assessment, we

24  would not expect that to be the situation.

25  Q          But it would have an impact if that did

1    occur?

2    A          If that did occur, it could have an

3    impact.

4    Q          Okay.  And if a doctor wanted to skew the

5    report to support a denial, the findings that he put

6    in his report, he could actually change the report

7    to support a denial, correct?

8                    MR. WILLIAMS:  Object to the form.

9    A          As we're talking about the independent

10   assessment of a physician who is certifying to be

11   independent, I would find that a very unlikely

12   scenario.

13   Q          But if he did, a doctor does have the

14   opportunity to skew the results one way or the

15   other, correct?

16                   MR. WILLIAMS:  Object to the form.

17   A          I would assume that to be the case, but I

18   think we're talking about things that I don't know

19   about with regard to independent assessment

20   physicians and how they operate.

21   Q          Are you aware that Unum was found to use

22   tactics like searching for the right doctor who

23   would give Unum the answer it wanted previously?

24                   MR. WILLIAMS:  Object to the form.

25   A          No, I'm not aware.

```
 1   Q          Have you reviewed the Hangarter case where
 2   Dr. Richard Feist testified as a former vice
 3   president?
 4   A          I have not.
 5   Q          Okay.  In an ERISA benefit claim, a
 6   claimant does not usually see a copy of the IME
 7   until after being denied; is that right?
 8                    MR. WILLIAMS:  Object to the form.
 9   A          That's correct.
10   Q          Okay.  And that denial could happen weeks
11   or months after the examination, correct?
12   A          The file itself is not provided to the
13   claimant until a denial.  So any information,
14   including the IME, would not be provided in an ERISA
15   case after the denial.  I -- I don't know the time
16   frame between -- I mean, that would be a very
17   claim-specific circumstance.
18   Q          But it could be a significant period of
19   time before the claimant reviews the medical
20   examination report?
21   A          As you said, it could be weeks.
22   Q          And if the claim is on appeal and the
23   appeal is denied and it's a final, there would be no
24   opportunity for the claimant to write a letter, put
25   notes in the claim file that would explain his side
```

1  A          I would agree that Unum does not want a

2  physician to skew results in one direction or the

3  other.

4  Q          And so if there is a doctor who is skewing

5  his results, do you not think that a recording of

6  the examination would influence that doctor to

7  correctly report the findings that he made at the

8  examination?

9              MR. WILLIAMS:  Object to the form.

10 A          I think that's a hypothetical situation

11 that -- I don't know what our position on it would

12 be.  I know what our position on recording is today.

13             Would this be an appropriate time to ask

14 for a break to grab a glass of water and run to the

15 ladies' room?

16             MR. ELLIS:  Sure.

17             MR. WILLIAMS:  Absolutely.

18             VIDEOGRAPHER:  The time is 5:53 -- or

19    10:53, and we're going off the record.

20        (Thereupon, a short break was had.)

21             VIDEOGRAPHER:  The time is 10:58, and

22    we're back on the record.

23 BY MR. ELLIS:

24 Q          We were talking about the possibility that

25 a doctor would attempt to skew the report.  Can you

1  tell me here that that's not a possibility at all?

2  No doctor would ever do that?

3  A          I can't say with certainty that nobody

4  would ever do that.

5  Q          If a doctor were to do that, would you

6  agree that Unum would have an interest in having a

7  complete documented record via video of the

8  examination?

9  A          Again, Unum would not want a physician to

10 skew results one way or the other.  But our policy

11 is that we do not have those entire exams recorded.

12 Q          But the stated policy was because you're

13 worried that it would be altered.  So let's move

14 beyond that and look at -- the actual question is:

15 Would Unum have an interest in having the entire

16 examination recorded if there was a doctor who was

17 going to skew the results?

18                 MR. WILLIAMS:  Object to the form.

19 A          Again, I can't speculate as to that

20 circumstance when we -- our written procedure is

21 that we do not -- we do not accept requests for

22 recording.

23 Q          Generally?

24 A          Generally.

25 Q          A video-recording of an examination would

1  help in assessing whether or not the examination

2  report was skewed one way or the other, wouldn't it?

3                  MR. WILLIAMS:  Object to the form.

4  A          I think that the other concern that's not

5  being discussed with that is how people may alter

6  their behavior within the exam itself.  So while

7  that might -- while you might have a true and

8  accurate record of the exam, assuming that it's not

9  altered, you have the other concern of people

10 altering their behavior in the exam itself.

11 Q          You mentioned before that there are states

12 that require insurers to allow a witness or somebody

13 to record the examination, right?

14 A          Correct.

15 Q          How many states are there?

16 A          That, I don't know.

17 Q          Do you have a ballpark?

18 A          I believe it's a low number, but I don't

19 have a ballpark.

20 Q          More than five?

21 A          I don't know.

22 Q          Okay.  But there are states that do

23 require that?

24 A          Correct.

25 Q          Okay.  You would at least agree that a

```
1   claimant has an interest in having a video-recording
2   of an examination if the doctor were to skew the
3   report one way or the other?
4               MR. WILLIAMS:  Object to the form.
5   A        It's very hard for me to speculate on both
6   what the claimant wants and the hypothetical that we
7   would know that a physician was going to skew
8   results.
9   Q        I'm not asking you to assume that you
10  would know.  I'm asking you to assume that there is
11  a doctor, one doctor, that would do that.  Would the
12  claimant have an interest in having that examination
13  recorded?
14  A        Speculating, I -- I hate to speculate on
15  what a claimant would want or would not want, but I
16  can see that point, yes.
17  Q        And it would be useful in that situation
18  to have a recording of the examination?
19  A        I don't know.
20  Q        You don't know?
21  A        It's a hypothetical situation, and I'm
22  speculating on what a claimant would want, what a
23  physician would do.  I believe I've stated that Unum
24  certainly doesn't believe and does not want those
25  reports to be skewed in one way or the other or one
```

1    direction or the other.

2    Q          Would you agree that the ERISA statute

3    requires a fiduciary to discharge his or her duties

4    solely in the interest of the participants and the

5    beneficiaries?

6    A          I'm not as familiar sitting with ERISA

7    today to know that's specifically what it states.

8    Q          Does Unum have to act in the interest of

9    its beneficiaries?

10              MR. WILLIAMS:  Object to the form.

11   A          Yes, we do.

12   Q          Okay.  And take their interest into

13   account more than its own interest?

14              MR. WILLIAMS:  Object to the form.

15   A          Yes.

16   Q          Okay.  So if a claimant has an interest in

17   having the video, should Unum take that into

18   account?

19   A          Again, I -- I would like to -- I believe

20   that to be correct based on my -- my understanding

21   of ERISA as I sit here and not speaking for ERISA

22   for the company.  But Unum takes claimants'

23   situations into account, correct, in general and

24   most circumstances.

25   Q          Okay.  Let's get back to the policy, just

```
 1  pages 21 through 23 of Exhibit 3.  Thank you.
 2  Looking at these three pages, is there any reference
 3  at all to whether or not a claimant should be
 4  allowed to bring a witness to an examination?
 5  A          It's specifically under -- the "Refusal to
 6  Participate in an Independent Assessment Unless it
 7  is Recorded" indicates that "Some states have laws
 8  providing that an insured may have a third party,
 9  (for example, videographer, transcriptionist, legal
10  representative) present during an IA."
11          So it lumps them together there, but I
12  don't believe elsewhere in the procedure it speaks
13  to a witness.
14  Q          But it doesn't say anywhere in this
15  procedure that it is Unum's policy to not allow a
16  witness to attend an examination, does it?
17  A          I don't believe so.
18  Q          Okay.  Does it say that -- does anywhere
19  else in Unum's claims manual say that Unum does not
20  allow a witness to attend an examination ordered by
21  Unum?
22  A          I don't believe it says so specifically.
23  The intent was to include witnesses, but I don't
24  believe it says so specifically in this procedure.
25  Q          What intent?
```

1  A          The intent that, if a witness were there,

2  the expectation would be that they would be taking

3  notes or in some way recording the event, which is

4  not allowed by our procedure.

5  Q          Where?

6  A          I'm sorry?

7  Q          Where?

8  A          Well, where it talks about when we ask

9  permission to record a conversation, we should

10 decline the request.  So no recording in any way.

11 Q          It's actually talking about an electronic

12 recording, isn't it?

13 A          I believe that was the intent of this

14 procedure was talking about electronic recordings,

15 yes.

16 Q          So let's talk specifically about a

17 witness.  There's nothing in this that says that a

18 witness is not allowed, correct?

19 A          It doesn't say anything specifically about

20 a witness except for, again, with regard to state

21 law, which is the exception, which includes allowing

22 witnesses or recordings.

23 Q          But the witnesses that it specifically

24 mentions are a videographer, transcriptionist, or

25 legal representative, not just a witness.  They were

1  specific people that might be making an electronic

2  record of the examination, correct?

3              MR. WILLIAMS:  Object to the form.

4  A        The first two, certainly.  A legal

5  representative would likely not be making an

6  electronic recording.

7  Q        Okay.  But, again, nothing in this

8  procedure or any other procedure that Unum has

9  states specifically that a witness is not allowed in

10 an examination hired by Unum?

11             MR. WILLIAMS:  Object to the form.

12 A        I don't see anything specific with regard

13 to a witness.

14 Q        And in this procedure, but anywhere else

15 either?

16 A        Not that -- that I am aware of.

17 Q        Okay.  And nothing in the two form letters

18 that we looked at mentioned that either?

19 A        No.  The form specifically -- that

20 Number 8 indicates "video, audio, or other recording

21 methods are to be utilized during the exam."  So if

22 a witness were to have a method of recording,

23 electronic or no, I would assume that that would be

24 something that Unum would be notified of, as

25 outlined in the form.

```
 1   Q          So Unum does not have a policy that
 2   excludes or -- sorry.  Unum does not have a policy
 3   that a witness is not allowed in the examination of
 4   a claimant?
 5                MR. WILLIAMS:  Object to the form.
 6   A          Well, not specifically outlined in this
 7   procedure document.  I believe that that is our --
 8   is our regular practice.
 9   Q          But if -- the specialists are not trained
10   on that, correct?
11   A          There's no specific training with regard
12   to the third party, that I am aware of, that's not
13   recording.
14   Q          And the training that you referenced that
15   says, "Refer back to the claims manual," if a
16   benefit specialist followed that instruction, they
17   would look at a claims manual that did say that a
18   witness is refused, correct?
19   A          Again, it doesn't say anything
20   specifically in this document or the documents in
21   the claims manual that I'm aware of, but that is our
22   general practice.
23   Q          How would a disability benefits specialist
24   or an appeals specialist come to understand that
25   that is Unum's general practice?
```

```
 1   A          From work with the independent assessment
 2   network, from referring independent assessments out.
 3   Q          How would the independent assessment
 4   network understand that that is Unum's procedure?
 5   A          It is not documented in our claims manual
 6   practice; so I'm not sure.
 7   Q          It's a very thorough claims manual,
 8   correct?  I mean . . .
 9   A          Covers a number of topics, correct.
10   Q          In great detail, correct?
11   A          Many of those topics are covered in great
12   detail.
13   Q          Unum brags to other insurance companies
14   about their claims manual and how exhaustive it is,
15   correct?
16                 MR. WILLIAMS:  Object to the form.
17   A          That, I don't know.
18   Q          Really?
19   A          I know that Unum is proud of the benefits
20   in our claims manual that they have.  Whether they
21   brag to other insurers, I don't know.
22   Q          Okay.  But your testimony today is that,
23   even though it's not in the claims manual and
24   there's no record of it anywhere in any of the
25   training documents or anywhere on paper at Unum,
```

1    we had to honor that request.  And the very specific

2    claim scenario, you know, other things they may look

3    at is whether the physician would even honor the

4    request if we did.  So many physicians will not

5    allow recordings either.  And then they will go to

6    the DBS and say whether or not this particular claim

7    meets an exception and recording should be allowed.

8    Q         Reading the paragraph in sequence, it

9    appears to me that before you ever go to the

10   potential hired provider, the claimant's request

11   would be granted or denied; is that correct?

12   A         I think in most circumstances that's

13   correct.

14   Q         So the claimant makes the request, the DBS

15   and the DLR confer, the request is granted, and then

16   Unum approaches the hired -- hired doctor; is that

17   right?

18   A         In most circumstances -- again, first, we

19   would look at state law.  And then, in most

20   circumstances -- not every, but in most

21   circumstances, it would be declined.  If it was

22   approved, yes, it appears from the documentation the

23   IA provider would -- would be advised, and that

24   request would go to the IA provider.

25              I believe that those may be

1  contemporaneous.  I understand the document says,

2  you know, this will happen first, and then the IA

3  will be consulted next.  There may be

4  circumstances -- again, the DLR is looking at the

5  specific claim where it may be a contemporaneous

6  conversation.

7  Q          But it says specifically that the

8  claimant's request is granted before it even

9  mentions the medical professional that Unum hired.

10  So you can assume, based on the language here, that

11  Unum has already made a decision that it will grant

12  or deny the request at the time that they approach

13  the physician.

14  A          Yes.  I think that presumes, though --

15  because it first says, "Consult a DLR to assess the

16  appropriateness of the request and determine next

17  steps."

18          There may be circumstances where the IA

19  provider is part of that conversation of

20  appropriateness and -- and determining next steps.

21  If not, if that wasn't part of the DLR assessment,

22  then, certainly, after the request is granted, we

23  would have to determine that the IA provider would

24  accept that, would abide by a recording.

25  Q          Okay.  And we'll get to that in just a

1    second.  Let's go back to what you said:  Some

2    states have laws providing an insured may have a

3    third party.  It doesn't say in this procedure that

4    the only time that a request is granted is when the

5    state has a law about that issue, right?  It just

6    says that that is an example of when a request would

7    be granted, correct?

8    A          Correct.

9    Q          Okay.  So this is certainly not an

10   exclusive example of when a request is granted?

11   A          It's by far the most common, but it's not

12   an exclusive list, correct.

13   Q          Okay.  So if the request is granted by

14   Unum and the potential IA provider -- the provider

15   that Unum is potentially going to hire has a problem

16   with letting the recording go forward, what is the

17   procedure?

18   A          It would depend on the circumstances of

19   the claim.  If it were based on state law, it would

20   probably be unlikely that the provider would turn

21   down the request as well.  So it's -- generally, if

22   we're doing this because of state law, then the

23   provider would be bound by the state -- the same

24   state law.  If there are those rare circumstances

25   where an IA provider would not do so and were not

1    bound by state law, I don't know -- I don't know

2    what would happen in those particular circumstances,

3    because they are so rare.

4                We've, at that point, picked the

5    independent assessment provider because of their

6    speciality, because of their location, because of a

7    number of other reasons.  And, according to the

8    policy, we have the right to do so.  So it -- I

9    don't know what would happen -- happen in those

10   circumstances.

11   Q        But at this point, based on the policy or

12   the language in the policy -- I'm sorry -- in the

13   claims manual, it says that "a potential IA

14   provider."  So it's not final, correct?

15   A        The potential IA provider, correct.

16   Q        He hasn't been signed on or hasn't -- you

17   haven't paid him at this point, correct?

18   A        I don't know at what point in the process

19   the payment happens.  I would assume it would be the

20   end of the process.

21   Q        But he's at least still -- based on the

22   language used in your claims manual, he's still a

23   potentiality?

24   A        It would appear so, yes.

25   Q        Okay.  And -- and that's after the request

1   has been granted or denied, right? He's still a

2   potentiality after it has been granted?

3   A          I guess I'm not sure of the -- the -- yes.

4   Until the exam takes place, an independent

5   assessment provider is potential.

6   Q          So if Unum grants somebody's request to

7   have the examination recorded and then the doctor it

8   would potentially like to hire decides that he is

9   not going to be willing to accommodate the request

10  that Unum has already granted, Unum could go and get

11  another doctor -- another potential doctor who is?

12              MR. WILLIAMS:  Object to the form.

13  A          I don't know what we would do in that

14  circumstance, because, again, we've chosen this --

15  that particular provider based on their speciality,

16  location, the fact there's no conflict of interest

17  with the claimant, a number of factors.  So I -- and

18  as we have the right under the policy to choose a

19  provider, I don't know what would happen in those

20  circumstances if not bound by state law.

21  Q          But he's still a potential provider,

22  though, at that time.  He's not somebody that's

23  actually contracted to do the job yet at that point?

24  A          Until an examination takes place, I

25  would -- I would consider any provider a potential

1  provider.

2  Q        They don't sign anything to say, "I agree

3  to take this.  I agree to do this examination for

4  Unum"?

5  A        I believe that occurs.  I don't know what

6  point in the process that occurs.

7  Q        After Unum has granted the request or

8  denied the request?

9  A        My understanding is that until -- I would

10 assume that that would have to be after we have

11 determined whether a recording were to take place.

12 Again, as most of those exceptions are based on

13 state law, it's likely that the provider would be

14 bound by the same state law.

15 Q        So, then, you would agree that the fact

16 that this phrase is in there, "If the claimant

17 request is granted, the potential IA provider will

18 also need to be advised and provide a comment," that

19 the scenario comes up when it's not a state-law

20 issue?

21               MR. WILLIAMS:  Object to the form.

22 A        I'm not -- I'm not aware of any specific

23 claim scenarios that have come up outside of the

24 state law requirement.  There may be those.  I don't

25 know about them.

1    Q       If the provider says that he's not

2    willing, Unum could go and find a different provider

3    that is, correct?

4    A       I believe that they certainly could do

5    that.  I don't know whether they would do that, as

6    they don't have to do that under the policy.

7    Q       So they could overturn their grant of the

8    request?  Is that what you're saying?

9    A       Oh, I'm sorry.  Yes.  They could if not

10    required to do so by state law.  If the provider

11    that was chosen based on the criteria that the

12    provider met would not approve of the request, that

13    could happen.

14    Q       Because the policy or the claims manual

15    has the very definitive past tense "is granted."  It

16    doesn't say anything about Unum overturning that

17    grant in the claims manual, does it?

18              MR. WILLIAMS:  Object to the form.

19    A       There's nothing specific, but the claims

20    manual request is granted, meaning that we've agreed

21    to the claimant's request.  I think that there are

22    circumstances -- there could be circumstances where,

23    if the provider said that they do not agree and they

24    will not grant that request, then I don't know what

25    happens in those circumstances.

1    But if you would go to the reference, "Please refer

2    any questions to your manager," that was the

3    expectation, is that the DBS would go to their

4    manager, who you would help them to identify the

5    most appropriate resources.

6    Q         Okay.  Let's go to Topic 9.  I'm going to

7    skip 8, because we've covered that before.  "Whether

8    Unum allows claimants to have IMEs recorded and/or

9    witnessed and under what circumstances this is

10   allowed or disallowed."

11             So we've established that Unum does allow

12   examinations to be recorded under certain

13   circumstances, correct?

14   A         There are certain circumstances, correct.

15   Q         One of those circumstances would be if

16   state law requires it, correct?

17   A         I would say that's by far the most common

18   exception circumstance.

19   Q         Okay.  Outside of state law, what other

20   circumstances would Unum consider to be a valid

21   circumstance to lead it to grant the request?

22   A         I don't know of any other claim-specific

23   circumstances that I'm aware of that -- where this

24   is allowed, where this is permitted for -- as I

25   stated, you know, in developing this procedure, the

1  us to grant the request for recording.  So I think

2  that that is the most common overriding factor that

3  the DLR would be concerned with, "Was the state

4  involved?"

5  Q          And we've gone over that.  That's

6  certainly a concern of Unum.  It's not going to

7  violate state law.  But there's other factors.

8  There's other grants of having the examination

9  recorded.  So that's what I'm trying to get at is:

10  What would lead Unum to grant those?  We know they

11  occur, correct?

12  A          I -- the procedure allows for that to

13  occur.  I don't know of any specific claims where it

14  has or hasn't, but the procedure certainly allows

15  for it to happen.

16  Q          Okay.  So it's not against the procedure

17  for Unum to grant the request to have the

18  examination recorded?

19  A          After a review with the DLR.

20  Q          Okay.  And the procedure specifically

21  mentions that "Each Claim is unique, and you should

22  consult the policy terms."  Correct?

23  A          Correct.

24  Q          Okay.  Who has to approve a request to

25  record or have an examination witnessed?

REPORTER'S CERTIFICATE

STATE OF TENNESSEE    :
                      :
COUNTY OF HAMILTON    :

         I, Janet P. Tilley, do hereby certify

that the foregoing videotaped 30(b)(6) deposition

was stenographically recorded by me as stated in the

caption; LAURA KILMARTIN was duly sworn by me; that

pages 1 to 85, inclusive, were reduced to

typewriting under my direction and supervision; and

the deposition is a true and correct record, to the

best of my ability, of the testimony/evidence given

by the deponent.

         I further certify that I am not a relative

or employee or attorney or counsel of any of the

parties, nor am I a relative or employee of such

attorney or counsel, nor am I financially interested

in the action.  All rates charged are usual and

customary.

         This ___ day of May, 2018.

                    _____
                    Janet P. Tilley,
                    LCR and Notary Public.
                    Commission Expires: 3/7/2021
                    Tennessee LCR Number: 020

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# CHATTANOOGA DIVISION

LISA A. HOUSE,

      Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA, and UNUM GROUP
CORP.,

      Defendant.

Civil Action No. 1:17-cv-220

## PLAINTIFF'S AMENDED 30(b)(6) DEPOSITION NOTICE

To:    Unum Life Insurance Company of America and Unum Group Corp.
      By and through its counsel of record
      James T. Williams, BPR# 16341
      james.williams@millermartin.com
      832 Georgia Avenue, Suite 1200
      Chattanooga, TN 37402-2289
      Facsimile: (423) 785-8480

## I.    NOTICE OF DEPOSITION

PLEASE TAKE NOTICE THAT the Plaintiff, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the deposition of the Designated Representative(s) of the Defendants at the offices of Miller & Martin, located at 832 Georgia Ave., 12th Floor, Chattanooga, TN 37402 on the date of April 17, 2018 at 9:30 a.m. before a Certified Court Reporter or Deposition Officer authorized to administer oaths and record the taking of such testimony. This deposition will be recorded by audio-visual means with a simultaneous record being made. The deposition will continue from day to day until it is completed.

### A.    AREAS OF TESTIMONY

The Defendant is directed to "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on [the defendant's] behalf," and furthermore provide designations as to the "matters on which the persons will testify." The person(s) designated for the following areas shall be those person(s)

1



most knowledgeable and able to testify as to the following matters known or reasonably available to the Defendant.

The following is a description of the matters and areas for examination of the designated person(s):

6. The interpretation of the policy language at issue regarding the scheduling and conducting of IMEs ordered by Unum.

7. Defendants' policies, procedures, and/or training materials related to recording and/or witnessing IMEs.

8. Training given to employees regarding claimants' requests to have IMEs recorded and/or witnessed.

9. Whether Unum allows claimants to have IMEs recorded and/or witnessed and under what circumstances this is allowed or disallowed.

## II. PRODUCTION OF DOCUMENTS PURSUANT TO RULE 30.02(5)

For any documents produced at the date and location of the deposition, the deponent (or deponents) are requested to produce two complete COPIES of any and all documents reviewed in preparation for the deposition, including documents used in the claims processing procedure generally and specifically in this case, the claim file, and any other documents deponents based their statements on during the claims process and that they may base their statements on at the times and place indicated for the above depositions.

Submitted this 28th day of February, 2018.

ERIC BUCHANAN & ASSOCIATES, PLLC
ATTORNEYS FOR PLAINTIFF

BY: /s/Hudson T. Ellis
Hudson T. Ellis (#028330)
414 McCallie Avenue
Chattanooga, Tennessee 37402
(423) 634-2506
(423) 634-2505 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 28, 2018 this document, Plaintiff's 30(b)(6) Notice of Deposition, was sent via US mail and via electronic mail to the following:

> James T. Williams,
> james.williams@millermartin.com
> 832 Georgia Avenue, Suite 1200
> Chattanooga, TN 37402-2289
> Facsimile: (423) 785-8480

BY: ____/s/Hudson T. Ellis____
Hudson T. Ellis (#028330)

3