Volume I
Pages 1-304

UNITED STATES DISTRICT COURT
for the DISTRICT OF VERMONT

No. 1:09CV70

CAMILLA KELLY, D.O.,
    Plaintiff,

vs.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, and UNUM GROUP,
f.k.a. UnumProvident Corporation,
    Defendants.

* * * * *

DEPOSITION OF MAUREEN GRIFFIN, called as a witness by counsel for the Plaintiff, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Carol S. Kershaw, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at the Beechwood Hotel, 363 Plantation Street, Worcester, Massachusetts, on Thursday, June 3, 2010, commencing at 9:10 a.m.

**************************
FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (866) 532-5283
**************************

APPEARANCES:

    DAWSON & ROSENTHAL, PC
    BY: Steven Dawson, Esq.
        Anita Rosenthal, Esq.
    3550 North Central Avenue, Suite 1750
    Phoenix, Arizona 85012
    (602) 494-3800
    dandrpc@msn.com
    for the Plaintiff.

    LEWIS AND ROCA, LLP
    BY: Stephen M. Bressler, Esq.
    40 North Central Avenue
    Phoenix, Arizona 85004-4429
    (602) 262-5376
    sbressler@lrlaw.com
    for the Defendants.

ALSO PRESENT:
    Cesar R. Britos, Esq., UNUM
    Sean McDonald, Videographer

INDEX
Testimony of:  Direct  Cross  Redirect  Recross

MAUREEN GRIFFIN

By Mr. Dawson    5

EXHIBITS

| Exhibit No. | Description | For I.D. |
|---|---|---|
| 1 | UNUM Group Form 10-K 2-26-10 | 4 |
| 2 | Regulatory Settlement Agreement | 4 |
| 3 | Exhibit Marked But Not Used | 4 |
| 4 | Exhibit Marked But Not Used | 4 |
| 5 | Memo Dated 5-22-95 From R. Mohney | 4 |
| 6 | Exhibit Marked But Not Used | 4 |
| 7 | Exhibit Marked But Not Used | 4 |
| 8 | Worcester Customer Care Center 2001 Operating Plan | 4 |
| 9 | E-mail Dated 7-3-02 From D. Hersom | 4 |
| 10 | E-mail Dated 6-10-02 From D. Hersom | 4 |
| 11 | Exhibit Marked But Not Used | 4 |
| 12 | Exhibit Marked But Not Used | 4 |

(Exhibits with deposition transcript.)

PROCEEDINGS
* * * * *

(Exhibits Nos. 1 through 12 premarked for identification.)
* * * * *

THE VIDEOGRAPHER: This is the videotaped deposition of Maureen Griffin taken by the plaintiff in the matter of Camilla Kelly, DO versus Provident Life and Accident Insurance Company, et al., pending in the United States District for the District of Vermont, Civil Action No. 109CV70, being held today, June 3rd, 2010, at the Beechwood Hotel, 363 Plantation Street, Worcester, Massachusetts, commencing at 9:10 a.m.

The court reporter's name is Carol Kershaw; she is from the firm of Flynn Reporting, One Exchange Place, Worcester, Massachusetts. I am the videotape specialist; my name is Sean McDonald and I represent Valed Video, One Union Street, Boston, Massachusetts.

Counselors, if you would introduce yourselves, please.

MR. DAWSON: Steve Dawson and Anita Rosenthal for the plaintiff.

## Page 13

1  that have overturned with no new information.
2       I review the quality audits, random file
3  reviews that are conducted regarding the handling of
4  claims by our benefits specialists.
5       Q.  Just so I'm clear, the random file reviews,
6  is that the description of quality audits or is that
7  a separate thing?  I didn't understand.
8       A.  That's my descriptor.
9       Q.  Of quality audits?
10      A.  Correct.
11      Q.  Okay, and what else?
12      A.  I review complaints, trends in
13 litigation.
14      Q.  What is that report called, or maybe it's
15 called trends in litigation?
16      A.  I'm not specifically talking about any
17 particular report; I'm telling you what it is that I
18 look at in relation to insuring that we are
19 conducting our business with a high level of quality
20 and good faith and fair dealing and making the
21 appropriate decisions on the claims, so there's not a
22 particular report, litigation report, per se.  I do,
23 though, review and monitor litigation trends.
24      Q.  Is this available on OMAR as well or is

## Page 14

1  this somewhere else?
2       A.  I don't believe that's available on OMAR.
3       Q.  Okay.
4            When you look at trends in litigation, are
5  you looking at electronically stored information or
6  hard copy papers?
7       A.  Information that I might be provided by our
8  counsel.
9       Q.  Electronically or hard copy?
10      A.  It could be both.
11      Q.  Either or both?
12      A.  Yes.
13      Q.  And how often are you updated regarding
14 trends in litigation?
15      A.  Generally, on a monthly basis or so,
16 sometimes it could be bimonthly.
17      Q.  So once or twice a month, am I
18 understanding you correctly?
19      A.  Bimonthly, I'm using that term every other
20 month, but it could be monthly or it could be every
21 other month.
22      Q.  Fair enough.
23           Anything else under quality information?
24      A.  That's about what I can recall.

## Page 15

1       Q.  All right.
2            Now, I think the very first thing you
3  mentioned was metrics and reporting.  Is that
4  something different, other than what we've discussed
5  thus far?
6       A.  I'm not understanding the question.
7       Q.  Again, I had asked what have you looked at
8  with the idea of your deposition today.  I think the
9  very first thing you mentioned, or it was the first
10 thing I wrote down anyway, was metrics and reporting,
11 and then you said and quality information.  So
12 metrics and reporting, is that something separate,
13 other than what you've enumerated for us so far?
14      A.  No.
15      Q.  That would be more of an overarching
16 description of what you talked about so far?
17      A.  Correct.  Correct.
18      Q.  What's your job title with UNUM?
19      A.  Regional Vice President of Individual
20 Disability Benefit Operations.
21      Q.  Let me take a step back to things that
22 you've reviewed with the idea of your deposition
23 today.
24           Did you review the claim file from the

## Page 16

1  Kelly claim or any portion thereof?
2       A.  No.
3       Q.  Did you review any documents specific to
4  the Kelly claim?
5       A.  I did review the affidavits that I had
6  submitted in the claim or, excuse me, in the case.
7       Q.  In the litigation?
8       A.  Yes.
9       Q.  What about did you review any MITrak
10 information specific to Kelly?
11      A.  No.
12      Q.  Or PACE screens?
13      A.  No.
14      Q.  How long have you been a regional vice
15 president of individual disability operations?
16      A.  Since July of 2006.
17      Q.  And who preceded you in the position.
18      A.  I did not have a predecessor in the
19 position.
20      Q.  As of July 2006, the position of regional
21 vice president of individual disability operations
22 was created?
23      A.  No, as of -- no.  As of July of 2006 there
24 were two regional vice president positions that were

Page 169

1  operations.
2  Q. So it was your understanding in taking the
3  job on that you didn't really need to be concerned if
4  under your supervision the liability acceptance rate,
5  for example, went significantly up?
6  A. My understanding in coming over to the
7  claims organization is to manage and oversee
8  individuals handling our claims to insure that we
9  were handling the claims appropriately and
10 consistently with our claims practices and any, you
11 know, outcome, or recoveries, would be what they are.
12 The chips would fall as they are.
13        And the information, then, that would
14 populate any reporting on liability acceptance rate
15 or recoveries would be information that resulted from
16 the good faith and fair handling of the claims.
17        So there were no expectations other than,
18 if we want to use the term expectation generally, to
19 be very clear that we were handling our claims
20 appropriately, consistently, timely.
21 Q. So your understanding was that you didn't
22 really need to feel that you were accountable for the
23 liability acceptance rates, the recovery rates,
24 compared to what they had been traditionally, as long

Page 170

1  as you're just handling each claim as it should be
2  handled? Am I understanding you correctly?
3  A. Yes. That was information to understand
4  the business, yes.
5  Q. All right.
6        The subpart of Paragraph 10 -- I can't read
7  that paragraph. That's D -- paragraph D, Establish
8  that those corporate goals were transmitted to claim
9  handling units which felt the "reserve pressure."
10 Is there, in your operation today, any
11 sense of reserve pressure? And by that what I'm
12 referring to is pressure to reduce reserves or not
13 allow reserves to rise?
14 A. No.
15 Q. Have, in your capacity as vice president,
16 have you made efforts to change a culture of reserve
17 pressure?
18 A. To the extent -- yes, well, to the extent
19 that, as you were referencing, that type of culture,
20 that does not occur.
21 Q. And what steps have you taken to change the
22 culture of claims pressure?
23        MR. BRESSLER: Object to form.
24 Q. I'm sorry, of a reserve pressure?

Page 171

1        MR. BRESSLER: Same objection.
2  A. There are many steps that or many practices
3  today in place in benefit operations to insure that
4  there is not any pressure of any nature on our
5  benefit specialists who are deciding claims, other
6  than to do the work.
7  Q. Is that true for on the directors as
8  well?
9  A. Correct. It's true for the directors and
10 it's true for the AVPs.
11 Q. Okay, and what steps have been taken,
12 again, on your watch, to change this culture of there
13 being pressure about reserves?
14        MR. BRESSLER: Same objection. Form.
15 A. Reserves on our open claim block are not
16 reported through OMAR reporting. That's been
17 removed.
18 Q. Let me stop you for a second so I
19 understand. When you say reserves on your claim
20 block are no longer reported on OMAR --
21 A. Correct.
22 Q. -- are you saying that no reserve
23 information is on OMAR any longer, or are you
24 referring to some particular reserve information?

Page 172

1  A. I have reserve information on OMAR on
2  closed claims.
3  Q. So what reserve was recovered or released
4  by virtue of a closed claim?
5  A. Correct, not on open claims.
6  Q. Okay, what else?
7  A. In addition, there were multiple other
8  practices that are in place today that we've
9  conducted metrics communication training, with both
10 our managers or assistant vice presidents as well as
11 our directors, regarding types of communications that
12 should not occur with any of our benefit specialists
13 to insure that benefit specialists are not
14 interpreting any discussions around metric
15 communication to influence them in this feeling of
16 pressure, as you have stated it.
17        We provide annually that type of training
18 to our benefit specialists as well. And included in
19 that training is some clear instruction as to what
20 they can and should do if they feel in any way that
21 they are being pressured or influenced in making a
22 claim decision.
23 Q. I'm sorry, what about what they can do if
24 they are feeling pressured or influenced to make a

43 (Pages 169 to 172)

1  claims decision?
2      A.  They are told and encouraged to come
3  forward and speak to their manager or their manager's
4  manager.
5      Q.  Has anybody ever done that?
6      A.  Not to my knowledge.
7      Q.  Okay.
8      A.  Additionally, we have or the company has
9  implemented a hotline which is, it's an ethics
10 hotline that is administered by an entity outside of
11 the company, so it's an independent source.
12     Q.  That is required by the RSA, correct?
13     A.  I don't recall currently, but we do have
14 that in place.
15     Q.  Okay.
16     A.  We -- I'm sorry, while there was
17 discussion, I wasn't sure if I should stop.
18     Q.  Don't mind us.
19     A.  Okay.
20         In addition, there is periodic random
21 auditing of E-mails between DBSs and directors to
22 insure that there are no communications between a
23 director and a DBS that might in any way place a
24 disability benefit specialist in a position of

1  feeling like there's any pressure on them.
2      Q.  Let me ask this.  Have you stopped the
3  practice of -- you said no E-mails.  Have you stopped
4  the practice of the director coming to the DBS's
5  cubical and sitting done and saying, Do you have any
6  claims that you expect are going to be closing this
7  month?  Does that still go on?
8      A.  That's not a practice that we have in place
9  in operations.
10     Q.  Would you agree, if that practice was in
11 place, that that could have a tendency to exert some
12 pressure on the DBS?
13     A.  Yes, if a director came to a DBS and
14 said...
15     Q.  As I phrased it, do you have any claims
16 that you expect are going to be closing this month?
17     A.  Well, yes and no, because from an
18 informational standpoint and a second set of eyes on
19 a claim file, it would be and would be expected, it
20 would be appropriate and it would be expected for a
21 director to review portions of a claim file if a
22 matter was about to move to a place where benefits
23 were no longer payable.
24         So directors and DBSs have ongoing

1  discussions about claims, and if a director becomes
2  knowledgeable based on the facts of that claim that
3  it is likely that a claim may be moving in its normal
4  life cycle to a place where benefits might no longer
5  be payable or a close, as you've referred to it as,
6  then that type of discussion would be appropriate to
7  be occurring.
8      Q.  What I had asked and let me re-ask it,
9  is -- we'll ask two questions:  Whether the practice
10 was ongoing and whether you believed it could have a
11 tendency to put pressure on the DBS.  And that is, a
12 director coming and sitting down at the cubical of
13 the DBS and asking an open-ended question such as, Do
14 you think you're going to have any claims that will
15 close this month?  So let me break it down.
16         First, do you agree that that practice
17 could cause the DBS to feel they are looking for some
18 claims to close, thereby causing some pressure?
19     A.  That could.
20     Q.  And then, secondly, is that practice
21 done?
22     A.  No.
23     Q.  You agree that because it could cause some
24 pressure on the DBS, it would be an improper

1  practice?
2      A.  To speak with the DBS?
3      Q.  As I phrased it.
4      A.  As you phrased it, that would not be
5  proper, that wouldn't be consistent with what we
6  would expect and we would expect of our directors in
7  having discussions with the DBSs, yes.
8      Q.  When you talk about a second set of eyes,
9  how that's a good thing, is it expected that a
10 director will take a second look when a DBS has
11 recommended that a claim be terminated?
12     A.  A director is usually knowledgeable about
13 the claims that are being handled by their benefits
14 specialists, and so if a claim is moving towards a
15 place where benefits may no longer be payable, the
16 DBS would have a discussion with the director so the
17 director could take a look at the claim and/or
18 discuss the claim with the DBS.
19     Q.  All right, so it is expected that the
20 director would be a second set of eyes at a time that
21 a DBS is recommending termination, though?
22     A.  Generally, but there are times where there
23 may be exceptions.
24     Q.  But it's the better practice, correct?

1    A. Generally that does occur.
2    Q. Because it's the better practice,
3 correct?
4    A. Because that's consistent with our
5 practices, but there may be a circumstance where the
6 director isn't available or some other reason, but
7 generally, yes.
8    Q. If the director isn't available at the time
9 a DBS is recommending termination, should the AVP
10 step in the slot of the director and do that?
11    A. The AVP is one of the individuals that
12 would be made aware, should be made aware, of the
13 claim moving towards a place where payment will no
14 longer occur.
15         MR. DAWSON: I'm sorry, would you read
16 that back, Carol?
17         (Previous answer read by the
18 reporter.)
19    Q. How is the AVP made aware?
20    A. If an AVP is covering for a director, if
21 the director has taken some time off, then the AVP
22 may step in.
23    Q. Is the AVP made aware of a claim that
24 should be moving in the direction of closure just in

1 general?
2    A. An AVP would be aware of any change in
3 status or a change in status in that the assistant
4 vice president's whole block of inventory of claims
5 that they manage.
6    Q. We're talking about individual claims right
7 now?
8    A. Yes.
9    Q. So you're saying any change in status of
10 any claim in the block that the AVP is managing, he
11 or she should be aware of that?
12    A. Well, they can be aware of that.
13    Q. Well --
14    A. Through some of our reporting.
15    Q. So if there some of your reporting would
16 indicate that specific claims are expected to resolve
17 or close and that would come to the attention of the
18 AVP, is that true?
19    A. It would be in discussion -- yes, the
20 answer is yes.
21    Q. And do you engage in the practice where if,
22 say, one of those claims doesn't close, where the AVP
23 will look down to the director and say, Why didn't
24 it? Can you explain why that claim didn't close?

1 Does that happen?
2    A. An AVP may have a discussion with the
3 director simply and solely to understand if a change
4 in status didn't occur that the director believed
5 might occur, then there may be a discussion with the
6 AVP simply and solely to understand the facts of the
7 claim.
8    Q. And to understand the facts of the claim to
9 answer the question why did the closure not occur,
10 correct? I mean, that's the issue that we're talking
11 about?
12    A. Yes, to understand the facts because the
13 facts may have changed and the individual may have
14 continued to be eligible for ongoing benefits.
15    Q. In turn, the director might go to the DBS
16 and ask him or her why that claim did not close, tell
17 me the facts, correct?
18    A. That's not correct.
19    Q. How is that not correct?
20    A. Today in operations there is a very narrow
21 span of control, meaning that each director has no
22 more than five to six, generally, DBSs that any one
23 director is responsibile for managing. And so there
24 are ongoing claim discussions that occur between the

1 director and the DBS.
2         So, generally, the directors are quite
3 knowledgeable about the facts of the claims within
4 the inventory of the DBSs that they manage.
5         And if a claim was moving in a direction, a
6 file direction that benefits may no longer be
7 payable, a DBS and director generally would be
8 discussing that file because there are controls,
9 safeguards, essentially, in place today for directors
10 to look at that file and/or have discussions with the
11 DBS and then to have that file moved over for review
12 by our quality compliance consultants.
13         So the director would need to line up, so
14 to speak, the resources, the director's time, so they
15 could either have a discussion with the DBS, review
16 portions of the file or all of the file, and be sure
17 that that file moves over to our quality compliance
18 consultants.
19         MR. DAWSON: Carol, I am making you
20 work today. Could you read back my question because
21 I have forgotten?
22         (Previous question read by the
23 reporter.)
24    Q. Can I pull out from your narrative, No,

Page 181

1  that's not correct? Can you tell me, is that or is
2  that not correct?
3      A. I thought I responded to your question. I
4  was trying to tell you what in practice today
5  occurs.
6      Q. Here's my question. It's a yes or no
7  question. And in turn, might the director go to the
8  DBS and say, Why did that claim not close, or words
9  to that effect? Might that happen or not?
10     A. It's not likely that that would happen.
11     Q. Okay.
12         Would it, if it did happen, would you agree
13  that that could have a tendency to put pressure on
14  the DBS to work to close claims, yes or no?
15         MR. BRESSLER: Object to form.
16     A. It potentially might, but as I was trying
17  to explain, I understand that you're just asking me
18  that, but I'm trying to explain. That is not how in
19  practice the discussions occur and why we moved into
20  the alignment that we moved into.
21     Q. I'm sorry, I let that long narrative go on.
22     A. I heard that, I apologize. I'm just trying
23  to explain to you how in practice today we
24  function.

Page 182

1       MR. DAWSON: I understand, but I don't
2  want to have it happen twice.
3           If you want to break now, that's
4  fine.
5           THE VIDEOGRAPHER: Going off the
6  record. This is the end of Tape No. 4. The time is
7  2:42 p.m.
8           (Short recess taken.)
9           THE VIDEOGRAPHER: Going back on the
10 record. This is Tape No. 5. The time is 2:55 p.m.
11     Q. Ms. Griffin, going back to your comment
12 about it's good to have a second set of eyes for some
13 of these things. We talked about the director taking
14 a look at a potential termination. Assuming that the
15 director is there, that is part of their job,
16 correct?
17     A. Yes, the job of the director is to be
18 knowledgeable about the claims in the inventory,
19 yes.
20     Q. Right, but that wasn't my question. My
21 question was, assuming the director is there, part of
22 their job is to be a second set of eyes specifically
23 at the time that there's a recommendation for
24 termination of a claim; do you agree with that?

Page 183

1      A. I agree with that in -- yes, I agree with
2  that. My qualifier here, to be very clear, is just
3  that, you know, it's not expected that they review
4  every page --
5      Q. Well, I'm going to ask you that. So if we
6  can go question by answer, we can get the
7  information.
8      A. Sure. Sure.
9      Q. If you feel that we don't have all the
10 information, again, your counsel can follow-up with
11 questions?
12     A. Okay.
13     Q. So we've got a second sets of eyes are
14 good, specifically at the time of a recommended claim
15 termination. It's part of the director's job, if
16 they are there, to fulfill that role.
17         My next question is, and I think you were
18 starting to go into it, is do you expect at that time
19 that the director will take a look at the claim file?
20     A. It depends at that point in time.
21     Q. Okay.
22     A. If the director is knowledgeable of the
23 claim file because the director would have been
24 ongoing, you know, managing and supporting the DBS,

Page 184

1  the director may or may not review the full claim
2  file.
3      Q. So if the director has a working
4  familiarity with the claim file, then maybe they are
5  not going to maybe plow through everything again,
6  that would be an example of they wouldn't look at the
7  claim file carefully at the point of termination
8  being recommended, fair?
9      A. Yes, this's fair.
10     Q. Would you expect the director to look at --
11 let's say that the reason for the recommendation of
12 termination is that IME physicians and the in-house
13 physician feel that there are no longer restrictions
14 and limitations on the insured, though the attending
15 physician feels quite strongly to the contrary; just
16 assume that for a moment. In that situation, would
17 you expect the director to take a look back over the
18 medical records?
19     A. It depends on -- it depends on the file.
20 It depends upon the knowledge that the director has
21 acquired in working with the DBS up to that period of
22 time.
23     Q. The same thing, and tell me if this is a
24 fair summary.

Page 185

1 A. Sure.
2 Q. Yes, you would expect the director to look
3 over the medical record given the hypothetical that
4 I've given you, or to already have familiarity with
5 the medical record from his or her involvement in the
6 claim file?
7 A. Generally, but there may be some
8 circumstances that fall outside of that, generally.
9 Q. Generally speaking?
10 A. Generally speaking.
11 Q. Okay.
12 When the director, generally speaking, is
13 reviewing the medical record or is not because they
14 already are familiar with the medical record, that
15 should also include the portion of the medical record
16 that supports the claim, would you agree with that?
17 A. Yes.
18 And again, generally, because there may be
19 some circumstances outside of that.
20 Q. Now, we had some exchange before that,
21 well, maybe the director is not there, in which case
22 it's not going to happen, but the AVP may step in and
23 do that, do you recall that?
24 A. Yes.

Page 186

1 Q. If the AVP becomes the second look, would
2 you agree that the second look should be no less
3 meaningful just because now the AVP has stepped in to
4 the role of the director?
5 A. Generally, yes, I would agree. They are
6 not the only reviewers, though, potentially.
7 Q. Right now I'm asking you about this
8 director and an AVP if the director is not there, a
9 second look.
10 A. Okay.
11 Q. Yes you are in agreement if it is the AVP
12 who ask fulfilling the role of the director, then
13 they should either review the file if they are going
14 to agree upon -- let me wipe that out and step back
15 and ask you this?
16 I assume you would agree that the decision
17 to terminate a longstanding disability claim is an
18 important decision?
19 A. The decision to determine that benefits are
20 no longer payable under the policy for any of our
21 claimants is an important decision.
22 Q. Okay.
23 And it's a decision that can have
24 significant consequences to the policyholder, would

Page 187

1 you agree?
2 A. It depends.
3 Q. That's why I said it can, it can have
4 significant consequences to the policyholder?
5 A. It has the potential or may have the
6 potential.
7 Q. For example, if that is the primary source
8 of income for that person and they are not earning a
9 wage, that could have a significant impact if that
10 benefit stream is ended, would you agree?
11 A. It would depend on how significant that was
12 to the claimant.
13 Q. I tried to build in the significance, no
14 other income. Would you give me, already, that might
15 be significant?
16 A. That has the potential to be significant.
17 Q. It could be significant if no other income
18 and the policyholder also suffers from major
19 depression, it could be a significant news to learn
20 that your claim is being terminated, would you
21 agree?
22 A. It may have the potential, but it would
23 depend upon the facts to testify claimant and
24 circumstances.

Page 188

1 Q. That's why we're saying could, may,
2 possible. Can you give me that?
3 A. It's possible.
4 Q. Okay.
5 It wouldn't be surprising that it would
6 have a significant impact, it's foreseeable that it
7 could have a significant impact, would you agree with
8 that?
9 MR. BRESSLER: Object to form.
10 A. It's possible.
11 Q. You wouldn't go as far as foreseeable?
12 MR. BRESSLER: Same objection.
13 Q. Yes or no? You can say no, I don't care.
14 A. It's possible.
15 Q. My question is you wouldn't go as far as
16 foreseeable?
17 MR. BRESSLER: Same objection.
18 A. It depends upon the factual circumstances
19 for each individual.
20 Q. At the end of the day, so to speak, whether
21 it's the director, whether it's the AVP, or whether
22 it's the QCC, someone should be doing a careful,
23 considered, review of the recommendation to
24 terminate, would you agree?

1 the more recent years. We also consider any expected
2 future changes in claim resolution experience.
3 　　　Were you aware that what the claim
4 resolution rate is will be factored into the formula
5 to calculate what reserves need to be?
6 　　A. No, I'm...
7 　　Q. Okay, do you provide -- you mentioned
8 before that you were familiar with the claim recovery
9 rate, correct?
10 　　A. Claim recoveries, yes.
11 　　Q. Just by a total gross dollar number?
12 　　A. Yes. Well, on one of the reports that I do
13 have access to, my recollection is that there is a
14 percentage on it in relation to recoveries, so if
15 that's considered a recovery rate, then, yes, I do
16 review that.
17 　　Q. So your claim recovery rate tends to run in
18 what areas, percentage-wise?
19 　　A. Well, it depends. It depends in relation
20 to how it's broken out, and I'm reflecting back on
21 the recovery reason trends, and so I may not be
22 accurate about speaking about it in terms of a
23 recovery rate.
24 　　　What I monitor are the recovery counts, so

1 I just want to be clear that there may be a
2 difference between both of those.
3 　　Q. All right, I don't understand what you're
4 saying right now, but claim recovery rates you said
5 you believe are stated in terms of a percentage; did
6 you state that or not, or are you stating that now?
7 　　A. Let me clarify, please. I monitor and
8 review the claim recovery counts.
9 　　Q. Okay, what is a claim recovery count?
10 　　A. It's just a number. It's just a number of
11 the count.
12 　　Q. What does it represent?
13 　　A. It represents a recovery in relation to a
14 claim, and that recovery can be any of the reasons
15 that I had earlier stated. It could be the return to
16 work.
17 　　Q. I still don't understand, let me interrupt
18 you.
19 　　A. Just numbers.
20 　　Q. I'm sorry, I promised I would do the depo
21 in seven hours, so I'm going to have to interrupt
22 you.
23 　　A. Okay.
24 　　Q. Your claim recovery count, it is a number,

1 but is it a number that represents the total number
2 of claims that closed for whatever reason, yes or
3 no?
4 　　A. The recovery counts are not set forth in a
5 percentage.
6 　　Q. Okay.
7 　　A. So I'm trying to answer your question.
8 　　Q. We're trying to do this yes or no.
9 　　A. To the extent that I can answer you yes or
10 no, I will certainly do that.
11 　　Q. Otherwise you tell me, no, I can't, and I
12 will as another question.
13 　　　Does claim recovery count as a number, is
14 that true?
15 　　A. Yes.
16 　　Q. And is it a number that represents -- is it
17 a dollar figure?
18 　　A. No.
19 　　Q. Is it a number that represents the number
20 of claims that have been closed for whatever
21 reason?
22 　　A. Yes.
23 　　Q. So you track that. Now, I think you
24 already told me you also track the dollar amount of

1 recoveries represented by reserves that were on those
2 claims that were released, correct?
3 　　A. Yes, I view that in a report, yes.
4 　　Q. In addition, is there a claim recovery rate
5 that you track in your job?
6 　　A. If there is, that's not something that I
7 monitor or track.
8 　　Q. Well, first of all, is there or is there
9 not a claim recovery rate that you have access to?
10 　　A. I don't know. I don't monitor and track.
11 　　Q. There might be, you don't know?
12 　　A. There might be, I don't monitor and track
13 all of the reports that are available in relation to
14 the business.
15 　　Q. All right, let's turn ahead to Page 143,
16 Note 6.
17 　　A. I'm sorry, what page?
18 　　Q. 143.
19 　　A. 143?
20 　　Q. Yes.
21 　　A. (Witness complies.)
22 　　Q. The first paragraph talks about how the
23 company had to put up more money because of the
24 reassessment process was resulting in more claims

1   I, MAUREEN GRIFFIN, do hereby certify that
2   I have read the foregoing transcript of my testimony,
3   and further certify that said transcript is a true
4   and accurate record of said testimony.
5
6       DATED AT _____,
7   this _____ day of _____,
8   2010.
9
10
11
12
13   _____
14
15
16
17      Signed under the pains and penalties of
18   perjury.
19
20
21
22   _____
23
24

1                CORRECTION PAGE
2   Page      Line       Correction
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1   COMMONWEALTH OF MASSACHUSETTS
2   Plymouth, ss.
3
4
5       I, Carol S. Kershaw, Certified Shorthand
    Reporter and Notary Public duly commissioned and
6   qualified in and for the Commonwealth of
    Massachusetts, do hereby certify that there came
7   before me on the 3rd day of June 2010 the person
    hereinbefore named, who was by me duly sworn to
8   testify to the truth and nothing but the truth of
    their knowledge touching and concerning the matters
9   in controversy in this cause; that they were
    thereupon examined upon their oath, and their
10  examination reduced to typewriting under my direction
    and that the deposition is a true record of the
11  testimony given by the deponent.
12      I further certify that I am neither
    attorney nor counsel for, nor related to or employed
13  by, any of the parties to the action in which this
    deposition is taken, and further that I am not a
14  relative or employee of any attorney or counsel
    employed by the parties hereto or financially
15  interested in this action.
16      In Witness Whereof, I have hereunto set my
    hand and affixed my seal this 14th day of June 2010.
17
18
19
                _____
20              Notary Public
                My Commission Expires:
21              September 23, 2016
22
23
24

1           FLYNN REPORTING ASSOCIATES
            Professional Court Reporters
2
            One Exchange Place
3           Worcester, Massachusetts 01608
            (508) 755-1303 * (617) 536-2727
4           TOLL FREE: (888) 244-8858
            FAX: (866) 532-5283
5   _____
6   Date:       June 14, 2010
    To:         Stephen M. Bressler, Esq.
7   From:       Carol S. Kershaw
    Case Name:      Kelly vs. Provident
8   Name of Deponent: Maureen Griffin
    Date Taken:     Thursday, June 3, 2010
9
    Enclosed Please Find:
10  Copy of transcript
11  Signature Requirements:
        Original transcript (or merely original
12      signature page) is enclosed for deponent's
        signature. If the deponent wishes to make any
13      corrections, a separate sheet of paper should be
        used listing the page number, the line of the
14      correction to be made, and the reason for the
        correction.
15      DO NOT mark up the transcript.
16  Please forward the signed transcript and/or signature
    page with errata sheet, if any, to:
17
    DAWSON & ROSENTHAL, PC
18  Steven Dawson, Esq.
    3550 North Central Avenue, Suite 1750
19  Phoenix, Arizona 85012
20  Filing:
    Filing was waived
21
    cc: Steven Dawson, Esq.
22
    Remarks:
23
24