```
IN THE CIRCUIT COURT FOR
HAMILTON COUNTY, TENNESSEE
--------------------------------------
KAVITHA GINJUPALLI, D.D.S.,          *
          Plaintiff                  *
                                     *
                    No. 16 C 150     *
                                     *
vs.                                  *
                                     *
                                     *
PROVIDENT LIFE AND ACCIDENT          *
INSURANCE COMPANY d/b/a UNUM,        *
THE UNUM GROUP,                      *
          Defendants                 *
--------------------------------------
--------------------------------------
DR. CHARLES SITOMER,                 *
          Plaintiff                  *
                                     *
                    No. 15 C 971     *
                                     *
vs.                                  *
                                     *
                                     *
THE PAUL REVERE LIFE INSURANCE       *
COMPANY; THE UNUM GROUP,             *
          Defendants                 *
--------------------------------------
          VIDEOTAPED CONFIDENTIAL DEPOSITION of ANTHONY
SCUDERI, a witness called by and on behalf of the
Plaintiffs, taken pursuant to the provisions of the
Massachusetts Rules of Civil Procedure, before Dawn T.
Rabbitt, a Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts, at
The Beechwood Hotel, 363 Plantation Street, Worcester,
Massachusetts 01605, on Tuesday, February 13, 2018,
commencing at 1:23 p.m.
```

O'Brien & Levine Court Reporting Solutions
888.825.3376 - mail@court-reporting.com

```
 1   A P P E A R A N C E S

 2

 3   HUDSON T. ELLIS, ESQUIRE

 4   Eric Buchanan & Associates, PLLC

 5   414 McCallie Avenue

 6   Chattanooga, TN 37402

 7   (423) 634-2506

 8   ellish@buchanandisability.com

 9   Counsel for the Plaintiffs

10

11   JONATHAN M. FEIGENBAUM, ESQUIRE

12   184 High Street, Suite 503

13   Boston, MA 02210

14   (617) 357-9700

15   jonathan@erisaattorneys.com

16   Counsel for the Plaintiffs

17

18   JAMES T. WILLIAMS, ESQUIRE

19   Miller & Martin PLLC

20   832 Georgia Avenue, Suite 1200

21   Chattanooga, TN 37402

22   (423) 756-6600

23   James.williams@millermartin.com

24   Counsel for The Defendants and Anthony Scuderi
```

1  format to what it would have been, yes.

2  Q.  So, we would have the change in status page;

3  correct?

4  A.  Yes.

5  Q.  And the value in the second to right-hand column?

6  A.  Correct.

7  Q.  The Social Security Number, claim number, and a

8  claimant's name?

9  A.  To the best of my recollection if could have,

10  yes.

11  Q.  Did it, and I believe that your testimony in your

12  previous deposition was that it did.

13  A.  Looking at this, I can't say that it's exactly

14  this document, but I would presume that it would have

15  that information, yes.

16  Q.  If Maureen or Scott was not in the office and

17  their administrative assistant did not bring this

18  document over to you, was there any other way that you

19  as an Assistant Vice President could access the values

20  to populate your spreadsheet?

21  A.  Not to my recollection, no.

22  Q.  So, you couldn't go onto Omar and pull the value

23  for a specific claimant; correct?

24  A.  I could not.

1    Q.   And you could not pull this version of the report

2    or a version of the report that had the values for each

3    individual claimant; correct?

4    A.   I could not.

5    Q.   Could any other Assistant Vice Presidents pull

6    that information, that reserve amount for each specific

7    claimant?

8    A.   Not to my recollection, no.

9    Q.   Could any directors pull that information from

10   Omar?

11   A.   No.

12   Q.   A Vice President could pull reserve information

13   for specific claimants?

14   A.   I don't how they obtain information.  I don't

15   remember how they received it.

16   Q.   So, Ms. Griffen or Mr. Scott would have be an

17   able to -- you just don't know where this report came

18   from I guess?

19   A.   That's a fair statement, yes, I don't know where

20   it came from.

21   Q.   Okay.  In your previous deposition you mentioned

22   that you received this or the document that had this

23   information from Ms. Griffen or Scott's administrative

24   assistant, do you remember that?

Case 1:17-cv-00220-HSM-CHS   Document 49-7   Filed 06/27/18   Page 4 of 15   PageID #:
1147

1   Q.  I want to go back and make sure that I'm clear on

2   this.  Was there any other way other than getting the

3   information through your Vice President that you could

4   obtain reserve information on specific claimants?

5   MR. WILLIAMS:  Object to the form, asked and

6   answered twice.

7   A.  I couldn't, no.

8   Q.  Do you know the reason for that?

9   A.  I don't.  I mean, it was just not something that

10  was available to us.

11  Q.  And by us you mean that an Assistant Vice

12  President you did not have access to reserve information

13  for specific claimants?

14  A.  Correct.

15  Q.  Did you tell Maureen about this spreadsheet and

16  tell her what you were doing and ask her if she could

17  give you that information about the reserves for the

18  specific claimants?

19  A.  I don't ever recall a discussion of that nature,

20  no.

21  Q.  Do you ever remember a time when your supervisor

22  did not provide you the information about reserves in

23  the claims that you were supervising?

24  MR. WILLIAMS:  Object to the form.

Case 1:17-cv-00220-HSM-CHS   Document 49-7   Filed 06/27/18   Page 5 of 15   PageID #:
1148

1    A.   I don't recall a specific time, no.

2    Q.   And I guess what I'm asking is, from the time

3    that you became an acting Assistant Vice President, were

4    you provided the information about the reserves or the

5    claimants that you were supervising?

6    A.   To the best of my recollection, yes, I was.

7    Q.   Okay.  Did that ever stop while you were at Unum,

8    did they stop providing that information to you?

9    A.   In the capacity as an acting AVP or AVP?

10   Q.   Correct.

11   A.   Not to my recollection, no.

12   Q.   And as far as you're aware, the other Assistant

13   Vice Presidents or acting Assistant Vice Presidents were

14   being provided the same information that you were by

15   their Vice President; correct?

16   A.   That was my presumption, yes.

17   Q.   Did you ever discuss it with the other Assistant

18   Vice Presidents?

19   A.   I did not.

20   Q.   Was there a specific procedure that Maureen was

21   following, that Ms. Griffen was following, in providing

22   you the reserve information of the specific claimants?

23   MR. WILLIAMS:  Object to the form.

24   A.   I don't recall a specific format that she

1    utilized, no.

2    Q.  Did she ever tell you the reason why she was

3    giving you the information?

4    A.  She didn't give me a specific reason, no.

5    Q.  You said that the claimants that were listed in

6    your spreadsheet were placed there based on them showing

7    up in the change in status report; right?

8    A.  I think that's what I said, yes.

9    Q.  Did you ever manually insert somebody additional

10   that wasn't in the change of status report into your

11   spreadsheet?

12   A.  I'm sure that I did, yes.

13   Q.  And that may have been someone that you mentioned

14   as an ad-on, that type of person would show up as an

15   additional?

16   A.  Are you done, I'm sorry?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Where would you get your reserve information for

20   somebody that didn't show up in the change in status

21   report?

22   A.  I would probably ask Scott or Maureen.

23   Q.  So, it wouldn't have showed up in their report to

24   you either, so you would specifically ask, this claim is

Case 1:17-cv-00220-HSM-CHS   Document 49-7   Filed 06/27/18   Page 7 of 15   PageID #: 1150

1   closed, what was the reserve information so I can log

2   this?

3   A.  That's a fair assessment, yes.

4   Q.  Outside of the claim unexpectedly closing, is

5   there any other reason why you would add a claim or a

6   claimant to your spreadsheet that was not in the change

7   of status report?

8   A.  Can you repeat the question again, I'm sorry.

9   Q.  Sure.  Outside of the claim unexpectedly

10  terminating as an add-on, was there any other reason

11  that you would manually enter a claimant's information

12  in your spreadsheet if it wasn't in the change in status

13  report?

14  A.  I can't think of a specific reason why I would.

15  Q.  Was there any way that you as an Assistant Vice

16  Present for Unum were able to access the plan numbers

17  yourself?

18  A.  No.

19  Q.  That information would again just be available by

20  asking your Vice President or supervisor?

21  A.  That's correct.

22  Q.  And so the plan account numbers, those would only

23  be available by going to your Vice President?

24  A.  That's correct.

1    Q.   And the plan financial numbers were also only

2    available through your Vice President?

3    A.   That's correct.

4    Q.   Is there any document, training presentation or

5    manual that explains why you did not have direct access

6    as an Assistant Vice Present to specific reserve

7    information for claimants?

8    A.   Not to my recollection.

9    Q.   Were you ever told why you did not have direct

10   access and you had to go get it directly from your Vice

11   President?

12   A.   I don't think that I was ever told a specific

13   reason, no, if it was not information that was available

14   to me.

15   Q.   Did you ever ask?

16   A.   Nope.

17   Q.   You didn't ask any of your other Assistant Vice

18   Presidents why we can't get this information ourselves?

19   A.   No, I don't ever remember having that discussion

20   with an AVP, no.

21   Q.   And you didn't have that discussion with Maureen

22   or Scott your Vice Presidents either?

23   A.   Nope, I assumed it was just the way it was.

24   Q.   Okay.   When you were a director of claims back

Case 1:17-cv-00220-HSM-CHS   Document 49-7   Filed 06/27/18   Page 9 of 15   PageID #:
1152

1   A.  I don't know if they had a change in status.  The

2   change in status report was a report on Omar, it wasn't

3   something that they created.

4   Q.  But you described it as something that they would

5   obtain for themselves on a month basis, is that not a

6   fair description?

7   A.  They could, it was available to them.

8   Q.  And you told me that you had provided the reserve

9   information from the information that you received from

10  your Vice President, where would they put that reserve

11  information?

12  A.  I don't know where they would put it.

13  Q.  Did you provide it to them on the same sheets of

14  paper that you received from your Vice President?

15  A.  I did not.

16  Q.  Did you sit down with them and they took notes

17  while you ran the numbers off to them?

18  A.  I probably provided it verbally to them, what

19  they did with the information, I'm not sure how they

20  captured it.

21  Q.  Did you provide it to them verbally over the

22  telephone or were they in your office or with you

23  personally when you provided that information to them?

24  A.  Probably face-to-face, I don't think that I ever

1  did it over the phone.

2  Q.  And I guess what I'm trying to understand is if

3  my Assistant Vice President, if I was the director and

4  my Assistant Vice President were to provide me with a

5  long list of reserve numbers for claimants, I would

6  forget it immediately, did they have a notepad with them

7  and were jotting the numbers down, did they have a piece

8  of paper and were jotting the numbers, a computer?

9  A.  The best of my recollection was probably a pen

10  and paper.

11  Q.  So, they would sit down in your office with a pen

12  and paper and write down the information as you gave it

13  to them?

14  A.  That would be a fair assessment, yes.

15  Q.  And you would do this how frequently?

16  A.  I mean, maybe once a month.

17  Q.  Okay.  And you would give them the financial

18  reserve information for their claimants as well as the

19  plan numbers for the expected recoveries for that month?

20  A.  I would.

21  Q.  And the expected plan numbers for both financial

22  as well as account?

23  A.  I would.

24  Q.  Did you give that to them at the same time in the

1   account for how the block of business that I manage was

2   performing.

3   Q.  What about the directors, what advantage was

4   there to Unum for the directors to know the financial

5   reserve amounts for each of their claimants?

6   MR. WILLIAMS:  Object to the form.

7   A.  I don't know once again the advantage to Unum, I

8   would think it was similar to myself that they would

9   want to know how their block of business was performing

10  in relation to historical expectation.

11  Q.  What advantage would it be to Unum or director to

12  know the plan recovery amount financially as well as the

13  count for claims that they are supervising?

14  MR. WILLIAMS:  Object to the form.

15  A.  I think it's similar to what I just said, I think

16  it's ultimately to determine if their block of business

17  is performing in line or consistent with what historical

18  expectations of that block of business that we're

19  expected to perform.

20  Q.  Why would if Unum is looking at claims

21  individually based on their merit, a director need to

22  know the value associated with that claim?

23  MR. WILLIAMS:  Object to the form.

24  A.  I don't really know.

Case 1:17-cv-00220-HSM-CHS   Document 49-7   Filed 06/27/18   Page 12 of 15   PageID #:
1155

1  A.  I never did a time study like assessing where I

2  spent my time, I don't even know where to ballpark that.

3  Q.  Okay.  Would you say that you spent several hours

4  a day looking at the numbers?

5  A.  I wouldn't say several hours, no.  I don't know

6  what the number is, but I wouldn't be several hours.

7  Q.  What about when you were looking through a claim

8  file you said that that happened a few times a month,

9  how long would that take you when you were looking at a

10  claim file?

11  A.  It would depend.

12  Q.  And I guess I'm trying to get a sense of what

13  your job duties were in relation to what I'm seeing in

14  these documents, can you describe that for me?

15  A.  I probably can't describe it verbatim, but I'm

16  sure that there's a job description that provides that

17  information.

18  Q.  And that would be an accurate summation of what

19  you did?

20  A.  To the best of my recollection.

21  Q.  In each of these examples that we've discussed

22  that involved IME's in the Assistant Vice President

23  report, the claim was included in your projection claims

24  that would close that month, is that fair?

Case 1:17-cv-00220-HSM-CHS   Document 49-7   Filed 06/27/18   Page 13 of 15   PageID #: 1156

1   A.  Potential claims as well as others that they have

2   the opportunity to be recovered that month.

3   Q.  Right.  So, the claims that had IME's pending

4   were claims that were added towards the projected number

5   that led you to believe that you would meet -- those

6   were projected as closed claims; correct?

7   A.  As potentially closed claims.

8   Q.  True, okay.

9   MR. ELLIS:  James, I think that I'm done.

10  MR. WILLIAMS:  Okay.

11  CROSS EXAMINATION

12  BY MR. WILLIAMS:

13  Q.  Mr. Scuderi, when you were looking at a claim

14  involving an IME and projecting it as a potentially

15  closed claim, did you know the outcome of the IME before

16  it happened?

17  A.  No.

18  Q.  And an IME, that's an independent medical

19  examination; correct?

20  A.  That's correct.

21  Q.  And Unum had a process for signing those out and

22  finding doctors usually in the area of where the

23  claimant resided; correct?

24  A.  Yes.

```
 1   C E R T I F I C A T E

 2

 3        I, DAWN T. RABBITT, a Certified Shorthand

 4   Reporter and Notary Public duly commissioned and

 5   qualified in and for the Commonwealth of Massachusetts,

 6   do hereby certify that there came before me on the 13th

 7   day of February, 2018 at 1:23 p.m., the person

 8   hereinbefore named, ANTHONY SCUDERI, who provided

 9   satisfactory evidence of identification as prescribed by

10   Executive Order 455 (03-13) issued by the Governor of

11   the Commonwealth of Massachusetts, was by me duly sworn

12   to testify to the truth and nothing but the truth of his

13   knowledge touching and concerning the matters in

14   controversy in this cause; that he was thereupon

15   examined upon his oath, and his examination reduced to

16   typewriting under my direction; and that this is a true

17   record of the testimony given by the witness to the best

18   of my ability.

19

20

21   My Commission Expires:  September 21, 2023

22

23   _____

24                        Dawn T. Rabbitt, Notary Public
```