```
                    SUPERIOR COURT
                COUNTY OF SAN FRANCISCO


        CASE NO. 37-2015-00028243-CU-IC-CTL


CAROLYN M. WHITE, D.D.S.,                      )
      Plaintiff,                               )
VS.                                            )
                                               )
UNUM GROUP; PROVIDENT LIFE &                   )
ACCIDENT INSURANCE COMPANY;                    )
DAVE JONES AS COMMISSIONER OF                  )
INSURANCE; and DOES 1-20, Inclusive,           )
      Defendants.                              )


             CASE NO. CGC-15-549537


                                               )
NATALIE K. MUTZ,                               )
      Plaintiff,                               )
VS.                                            )
                                               )
UNUM GROUP, THE PAUL REVERE LIFE               )
INSURANCE COMPANY; NANCY J. GARTON;            )
DAVE JONES AS COMMISSIONER OF                  )
INSURANCE; and DOES 1-20, Inclusive,           )
      Defendants.                              )



             CASE NO. CGC-16-551085


                                               )
THOMAS J. PURCELL,                             )
      Plaintiff,                               )
VS.                                            )
                                               )
UNUM GROUP; THE PAUL REVERE LIFE               )
INSURANCE COMPANY; GENERAL AMERICAN            )
LIFE INSURANCE COMPANY; DAVE JONES AS          )
COMMISSIONER OF INSURANCE; and DOES            )
 -20, Inclusive,                               )
      Defendants.                              )
```

Page 18

1  A. I mean, I would say it was typically
2  just talking about whatever was relevant at the
3  time. It could be something related to staffing,
4  it could be something related to quality if there
5  was something that was relevant to be passed on
6  to the people attending that might help them
7  learn something or to do their job better. It
8  could be a change in process or procedure that we
9  wanted to talk about in order to make sure
10 everybody understood and was on the same page.
11     Q. How many claims were being handled by
12 the individuals, the directors, the team of
13 directors that reported to you?
14     A. How many claims did each director
15 have?
16     Q. Yeah. Well, in aggregate. So for the
17 -- for the six directors, how many -- what was
18 the size of the inventory of claims that you were
19 responsible for managing essentially?
20     A. You know, as a rough estimate, I would
21 say each of the directors had probably 250 to 300
22 claims. So an aggregate times six would be 1500
23 to 1800 if my math is right.
24     Q. And over the last few years, was that

Page 19

1  a fairly consistent number?
2     A. Yes.
3     Q. How did you -- let me hand you what
4  was marked as Exhibit 4 to this morning's
5  deposition of Holly Crawford, and it's a
6  Performance Plan 2014 for the Benefit Operations
7  -- have you seen this before? For the director
8  position. Have you seen this before?
9     A. Yes.
10    Q. And could you tell me what this is.
11    A. As it says, it's a Performance Plan
12 which is I guess Unum terminology for kind of an
13 outline of the key areas of responsibility for a
14 given position.
15         So in this case, for a director in
16 the -- it says benefits, but it's just -- it's a
17 synonym for claims. So it's a summary of the job
18 responsibilities for a director in our claims
19 organization.
20    Q. Under operating excellence, in the
21 second bullet point, it says, "Demonstrates
22 effective and efficient inventory management and
23 claim forecasting," do you see that?
24    A. Yes.

Page 20

1     Q. How did you assess whether the
2  directors that you were supervising demonstrated
3  effective and efficient inventory management?
4     A. There were several metrics that we use
5  relative to the -- I guess I would say quality
6  and service aspects of how claims were handled.
7     Q. What metrics are you specifically
8  referring to?
9     A. Well, in that section under
10 Measurement, you'll see reference to a quality
11 and service scorecard and ICA exception rate.
12 The scorecard contained multiple metrics related
13 to, again, I guess as the name implies, to the
14 quality of the handling, the timeliness and then
15 service to our customers.
16    Q. Did you use any other metric to assess
17 their effective and efficient inventory
18 management other than what was reflected on the
19 scorecards?
20    A. I'm not sure, because I don't recall
21 exactly which metrics were included in the
22 scorecard.
23    Q. What were the important ones to you?
24    A. I would say -- we had several quality

Page 21

1  metrics that measured the accuracy of the
2  handling of the claims. We had service metrics
3  that spoke to, you know, responding to customers
4  and making claim decisions in a timely manner.
5  And we had what we would call, you know,
6  operational metrics related to how a given
7  director was doing in relation to their recovery
8  expectations.
9     Q. What was that, a recovery expectation?
10    A. Each director had a monthly plan of
11 recoveries that based on history of their team
12 and based on the demographics of their block of
13 business that was thought to be what that block
14 of business should yield or generate in terms of
15 claim resolutions, and a resolution could be, you
16 know, paying the claim, not paying the claim,
17 moving the claim to the extended duration team
18 that we spoke about earlier, all of those things.
19    Q. Well, you mentioned that each director
20 had a plan based on recovery. Paying a claim
21 wouldn't be included within a recovery, would it?
22         MR. SHEA: Objection.
23 Mischaracterizes the testimony.
24    A. I think what I said is that one of the

First Legal Deposition - info@firstlegaldeposition.com    18 to 21
LA: 855.348.4997
Case 1:17-cv-00220-HSM-CHS   Document 49-8   Filed 06/27/18   Page 2 of 7   PageID #: 1160

Page 22

1  metrics or measurements that we used was
2  performance in relation to recoveries. And then
3  additionally, there were other metrics that spoke
4  to -- to other things. Paying a claim, again,
5  moving a claim to an extended duration unit,
6  things like that.
7     Q.   So did you communicate a recovery
8  expectation to your directors?
9         MR. SHEA:  Objection to the form.
10 Misstates prior testimony.
11    A.   Could you repeat the question, please.
12    Q.   Did you communicate a recovery
13 expectation to your directors?
14    A.   I would tell them at the beginning of
15 each month what the -- what the recovery plan or
16 expectations were for their teams.
17    Q.   And where did you get the information
18 to tell them what the recovery plan or
19 expectation was?
20    A.   I received it monthly from my manager.
21    Q.   Ms. Griffin?
22    A.   Maureen Griffin, yes.
23    Q.   And so she would e-mail the recovery
24 plan expectation to you?

Page 23

1     A.   She would give it to me, but it was
2  not by e-mail.  She would just verbally tell me.
3     Q.   Was this an important plan or
4  expectation for you?
5         MR. SHEA:  Objection.  Important to
6  him?
7         MR. COLEMAN:  Yes.
8     A.   The plan, the monthly plan was one of
9  the factors that was relevant to -- to my
10 performance and the performance of my team.
11    Q.   In what way was it important -- I'm
12 sorry, in what way was it relevant to your
13 performance and the performance of your team?
14    A.   Well, again, the plan, the monthly
15 plan was based on historical performance of a
16 given team and block of claims and was
17 representative of what that block of claims,
18 based on the demographics, so age and impairment
19 and so forth, you know, what it was expected to
20 result in.
21        So the plan and the measurement
22 against that plan was relevant in the sense that
23 it was one of the factors determining if the
24 block of business and the claims making the block

Page 24

1  of business up were being managed and handled
2  effectively.
3     Q.   How did you know that it was based on
4  historical and demographic information?
5     A.   That's what I was told.
6     Q.   Who told you that?
7     A.   My manager.
8     Q.   Ms. Griffin?
9     A.   Yes.
10    Q.   Did she tell you where she got the
11 number?
12    A.   Not a person, but it was my
13 understanding that it was given to her by our
14 finance organization.
15    Q.   And it's my understanding that
16 Ms. Griffin would give you this recovery number.
17 That's a dollar number, correct?
18        MR. SHEA:  Objection to preface.
19    A.   There were two numbers that we were
20 given on a monthly basis:  One was a number, a
21 count of recoveries; and the second was a dollar
22 figure as you said.
23    Q.   All right.  And the dollar figure
24 represented the claim reserves for the claims; is

Page 25

1  that right?
2     A.   My understanding is it represented
3  a -- what the release of reserves would be on a
4  given claim or at least an approximation of it if
5  that claim were to resolve.
6     Q.   And so she would give you those two
7  numbers every month orally; is that right?
8     A.   Pardon?
9     Q.   She would give you those two numbers
10 orally every month?
11    A.   Yes.
12    Q.   And so was there -- was there then a
13 segregated number by director that you were able
14 to arrive at?
15        MR. SHEA:  Objection.  Vague.
16    A.   On a monthly basis, I received a
17 number in aggregate for my organization as a
18 whole, and numbers for each of the director teams
19 underneath me, which in total would equal the
20 aggregate number I had been given.
21    Q.   Oh, so she would give a lot of numbers
22 to you.  So she would give you a claim count
23 number as well as the dollar figures for each
24 director?

First Legal Deposition - info@firstlegaldeposition.com         22 to 25
LA: 855.348.4997
Case 1:17-cv-00220-HSM-CHS   Document 49-8   Filed 06/27/18   Page 3 of 7   PageID #: 1161

Page 26

1 A. Yes.
2 Q. So she did this just this last month
3 at the beginning of October?
4 A. Yes.
5 Q. And so at the beginning of October,
6 you -- and did she have an office that you went
7 to or where did this communication take place?
8 A. It would vary from month to month. It
9 could be her office, my office, it could be, you
10 know, in a conference room if we were meeting in
11 one. It wasn't always the same.
12 Q. And so you would have to sit down with
13 a piece of paper and a pen to take the numbers
14 down?
15 A. Yes.
16 Q. And you did that each and every month
17 with her?
18 A. Yes.
19 Q. And so what were the dollar figures
20 that were communicated to you just last month?
21 A. I don't remember the specific numbers.
22 Q. Do you have an estimate?
23 A. You know, I would say on average, in a
24 given month, each director team might have

Page 27

1 between one million and two million dollars of --
2 of plan.
3 Q. So in aggregate, it would be around
4 five to ten million dollars a month?
5 A. Yes, for my team, my organization.
6 Q. Well, I guess with six directors, it
7 could be twelve. So six to twelve?
8     MR. SHEA: Objection. Calls for
9 speculation.
10 A. Again, each team was probably one to
11 two million is my best recollection, and then so
12 if I had six teams, it would be, you know, six
13 times that.
14 Q. Did you ever ask Ms. Griffin why you
15 had to write down this information as opposed to
16 it just being in a report that you could pull up
17 somewhere?
18 A. Not that I recall.
19 Q. Because you could pull up the claim
20 count information in a report, right?
21 A. I'm not sure I recall that either.
22 Q. Was there weekly tracking, a weekly
23 tracking report?
24 A. Yes, there was a report with that

Page 28

1 title.
2 Q. And did that just have the claim
3 counts or did that also have the dollar figures?
4 A. It did not have dollars, and I don't
5 recall if it had the claim count.
6 Q. Did you ever ask Ms. Griffin why she
7 always gave the information to you orally?
8 A. I did not. Not that I recall.
9 Q. And so then you communicated that
10 information to the directors?
11 A. Yes.
12 Q. And so did you e-mail them the
13 information?
14 A. No. I did that orally as well.
15 Q. Why did you give it to them orally?
16 A. It just seemed to always be the way we
17 had done it, the way I learned when I first
18 joined the claims organization.
19 Q. But it was important relevant
20 information for them to have?
21 A. It was part of something that -- one
22 of the things they were held accountable for.
23 Q. In what way were they held accountable
24 for it?

Page 29

1 A. Well, as we talked about earlier when
2 you asked me about the document, the performance
3 plan, and I said it was an outline or summary of
4 the key aspects of their job, you know, the --
5 how a given director performed in relation to
6 their plan expectation was one of the factors
7 that they were evaluated against.
8 Q. So given the fact that it was one of
9 the factors that they were evaluated against, did
10 you impress upon them the importance of achieving
11 the recovery plan every month?
12 A. That was one of several factors that
13 we talked about on an ongoing basis as something
14 that was important for them to focus on.
15 Q. How did you impress upon them the
16 importance of achieving the recovery plan?
17 A. I mean, it's hard to say, you know,
18 exactly, but we would have frequent discussions
19 about the importance of, you know, different
20 aspects of their job. And we would talk about,
21 you know, primarily the three areas of the
22 quality of the decision, the timeliness and the
23 accuracy of the decision, and the plan metrics
24 that we've been talking about.

First Legal Deposition - info@firstlegaldeposition.com    26 to 29
LA: 855.348.4997
Case 1:17-cv-00220-HSM-CHS   Document 49-8   Filed 06/27/18   Page 4 of 7   PageID #: 1162

Page 30

1  Q. So did you impress upon Mr. Sullivan
2  the importance of meeting the plan metrics,
3  including the recovery numbers?
4  A. Yes.
5  Q. And did you impress upon Mr. Loftus
6  the importance of meeting the plan metrics,
7  including the recovery numbers?
8  A. Yes.
9  Q. And how long did you supervise
10 Mr. Sullivan for?
11     A. During my ten years in the claims
12 organization, I think there were two separate
13 periods where Mr. Sullivan reported to me
14 separated by a period where he didn't. I don't
15 remember the exact length of those periods, but
16 in aggregate, the two periods when -- two time
17 periods when he did report to me would have been
18 several years.
19     Q. And he reported to you in 2014 and
20 2015; is that right?
21     A. I believe so, but I can't say for
22 certain.
23     Q. And when you met with him every month
24 and gave him the plan recovery metric, did you

Page 31

1  impress upon him the importance of meeting that
2  metric?
3         MR. SHEA: Objection. Assumes facts
4  not in evidence.
5     A. Again, it was part of my practice when
6  meeting with my directors and talking about their
7  performance to talk about several areas of focus:
8  Again, specifically the quality metrics; the
9  service metrics; and the plan metrics that you're
10 asking about.
11    Q. So did you -- would you periodically
12 then meet with the directors in the course of a
13 month to go over where their -- where they were
14 in relation to meeting the recovery metric for
15 that month?
16    A. I met with them periodically
17 throughout a given month, and we talked about how
18 their teams were doing with respect to all of the
19 key metrics that we have and that we've been
20 talking about.
21        So depending on the circumstances, we
22 would talk about how they were doing from a
23 quality standpoint. If some of their teams, if
24 some of the their DBSs had had recent quality

Page 32

1  reviews, we would talk about those and how they
2  did on those.
3        If -- you know, if we happened to be
4  talking about the other metrics, like service
5  metrics, we would talk about how their respective
6  teams were doing in relation to, you know,
7  timeliness of getting back to customers. If we
8  had had any complaints, if we had had any praise
9  from customers, whatever it would have been, you
10 know, that was related to that.
11       And, again, yes, we would have spoken
12 about how their respective teams were doing in
13 relation to the plan expectation.
14    Q. So, for example, if Mr. Sullivan had
15 been given a plan recovery number at the
16 beginning of the month of two million dollars,
17 would you meet with him periodically over the
18 course of that month and let him know where he --
19 where his team was in relation to achieving that
20 recovery figure?
21       MR. SHEA: Objection to the form.
22 Objection to the hypothetical.
23    A. Could you please repeat the question.
24    Q. Was it unclear or should I just have

Page 33

1  the court reporter read it?
2     A. I think it was multiple parts, so I
3  guess if you could repeat it, that would be
4  helpful.
5     Q. Sure. Just this last month, you met
6  with Mr. Sullivan, correct?
7     A. In the month of October, yes.
8     Q. Sure. And you gave him a recovery
9  number; is that right?
10    A. Yes.
11    Q. And it was in the one to two million
12 dollar range?
13    A. Yes.
14    Q. Over the course of October up until
15 your termination, did you meet with Mr. Sullivan
16 periodically and let him know where his team was
17 in relation to achieving that one to two million
18 dollar recovery number?
19    A. Yes.
20    Q. And is that something that you
21 typically did throughout your time supervising
22 Mr. Sullivan?
23    A. Yes.
24    Q. And is that also what you did while

First Legal Deposition - info@firstlegaldeposition.com    30 to 33
LA: 855.348.4997
Case 1:17-cv-00220-HSM-CHS   Document 49-8   Filed 06/27/18   Page 5 of 7   PageID #: 1163

Page 38

1  of that claim, it could be that they were
2  expecting a claim to move to the extended
3  duration team, it could be that that -- it could
4  move from a total to a residual claim or from a
5  residual to a total claim.
6      So, you know, there were several
7  different categories of changes in status that
8  they would populate on an ongoing basis, and I
9  would have access to the information that they
10 input into that system.
11     Q.  How would you access it?
12     A.  I could, you know, look at it online
13 on the system or I could look at a printed
14 version.
15     Q.  How did you look at it?  Both ways?
16     A.  Yes.
17     Q.  And in a printed version, would there
18 be a separate page for each claim that had a
19 given status?
20     A.  I don't recall it being a separate
21 page.  I just recall it being a separate section.
22 So there would be a section of the report for
23 recoveries, there would be a section for extended
24 duration, a section for residual to total or vice

Page 39

1  versa.  I don't recall if they were on separate
2  pages or just in separate sections.
3      Q.  I see.  So I'm just wondering when you
4  were going over at the time, so the directors
5  under you were managing about 1500 to 1800
6  claims, right?
7      A.  Not each director, but the total.
8      Q.  The total, right?
9      A.  Yes.
10     Q.  Okay.  Each one had about 250 to 300 I
11 think you told me.
12     A.  Yes.
13     Q.  And so you wouldn't print out a status
14 for 1500 to 1800 claims, that would be unworkable
15 for you, right?
16     A.  Not every claim had a change in status
17 in a given month.
18     Q.  Okay.  So a change -- what exactly do
19 you mean as a change in status?  Because if
20 there's -- and I understand that one of the codes
21 for this status is a possible recovery, right?
22     A.  Yes.
23     Q.  Okay.  If a claim is -- is still open,
24 but it has the same status, that is possible

Page 40

1  recovery for multiple months, how would that show
2  up on a change in status?
3      MR. SHEA:  Objection.  Vague.
4      A.  Again, on an ongoing basis, the
5  directors would populate this tracking tool and
6  indicate if they were expecting some type of
7  change in status in a particular claim.
8      Q.  I see.  So it's a forecasted change in
9  status, that is in this month, there -- there is
10 a possible change in the status?
11     A.  I would say it's a forecasted or
12 anticipated status.  It could be for this -- for
13 a current month, it could be for, you know, one
14 month, two months, three months, six months.  I
15 don't remember what the outer limit was, but it
16 would be for some point in the future.
17     Q.  I see.  And so did you print out on
18 occasion all of the claims that had a --
19 information regarding all of the claims that
20 would have a possible recovery as its change in
21 status?
22     A.  I don't know if this is too fine a
23 distinction, but I probably didn't personally
24 print it out.  I had an administrative assistant

Page 41

1  who might print it out.  So I just want to --
2      Q.  Sure.
3      A.  -- make sure I'm answering the
4  question correctly.
5      Q.  All right.  And so could you describe
6  what you were provided in terms of the printout
7  in that regard?  Is it a list of claims or does
8  each claim have its own separate page or what?
9      A.  It would be a list of claims where a
10 director had entered in the tracking system a
11 change in status that was anticipated for the
12 future.  It would depend if I -- you know, if the
13 report showed just a given month or if it showed
14 the next three months.  So the time frame might
15 vary, but it would be a listing of those claims.
16     Q.  And so what information regarding each
17 claim would it provide?
18     A.  I'm trying to remember.  It would have
19 the -- the name, the claim number, it might have
20 had the state and the age.  It would have what
21 the anticipated change in status was, whether it
22 was categories we talked about before, recovery
23 or extended duration and so forth.
24     Q.  What about the reserve information?

First Legal Deposition - info@firstlegaldeposition.com
LA: 855.348.4997
38 to 41
Case 1:17-cv-00220-HSM-CHS   Document 49-8   Filed 06/27/18   Page 6 of 7   PageID #: 1164

Page 42

1  A. If I printed the report myself or -- I
2  didn't have direct access to the reserve
3  information, so in some cases, it would, and
4  other cases would not have that information.
5  Q. What do you mean in some cases it
6  would, and in other cases it wouldn't?
7  A. ==If I printed the report, it would --==
8  ==would not contain the reserve information.  If==
9  ==I -- again, I didn't have direct access, so if I==
10 ==asked my manager or her administrative assistant==
11 ==to print it, then we could have -- I could==
12 ==receive the report that would have a -- not an==
13 ==exact dollar figure for the reserve, but an==
14 ==approximation or a rounded number.==
15 Q. And so you asked Ms. Griffin or her
16 assistant to provide that type of reporting for
17 you?
18     MR. SHEA: Objection.
19 Mischaracterizes.
20 A. ==It was something that we typically,==
21 ==you know, received on a monthly basis.==
22 Q. ==Oh, you typically received that.  How==
23 ==did you receive it?==
24 A. ==It would typically be Ms. Griffin's==

Page 43

1  ==administrative assistant.==
2  Q. Would she hand it to you or how would
3  you get it?
4  A. Yes, it would -- it would be a paper
5  report.
6  Q. Was there a title of this paper
7  report?
8  A. It might have said change in status,
9  but I can't say for sure.
10 Q. And so did you -- did you get this on
11 a monthly basis?
12 A. Generally, yes.
13 Q. And it would list all of the recovery,
14 the possible recovery claims?
15 A. Yes.
16 Q. Did it list any other type of possible
17 change in status claim?
18 A. I don't recall.
19 Q. So did you get a listing from
20 Ms. Griffin's assistant of all of the claims that
21 hadn't had a decision yet, that is were still
22 undecideds?
23 A. No. The listing would be for the
24 claims that the directors had identified as a

Page 44

1  potential upcoming change in status.
2  Q. Did her assistant provide you with a
3  list of all the claims where a reservation of
4  rights had still been on the claim for a period
5  greater than 90 days?
6  A. No.
7  Q. How about for those claims that --
8  where there was a reservation of rights still
9  assigned to it for a period greater than 120
10 days, were you regularly provided a list of those
11 claims?
12 A. I was not provided with it, no. I
13 could view it if I chose to, but I wasn't
14 provided with it.
15 Q. But your supervisor didn't regularly
16 provide that information to you, what she
17 provided to you was a list of the claims where
18 there was a possible change in status of
19 recovery?
20 A. She didn't provide me with reports
21 that I had access to myself. So the reports that
22 you mentioned like the reservation of rights
23 report is something that I had access to. And so
24 she didn't provide me with something that I could

Page 45

1  see on my own. She provided me with a report
2  that I would not have otherwise had access to.
3  Q. So did you regularly review a list of
4  claims that had, for example, a reservation of
5  rights assigned to it for a period greater than
6  90 days?
7  A. Yes.
8  Q. And the same for 120 days?
9  A. Yes.
10 Q. Now, how many claims would typically
11 be on this list that you were provided by
12 Ms. Griffin or her assistant?
13 A. Each director team could have, you
14 know, I mean, it's an approximation, but anywhere
15 from, you know, 10 to 50 claims in a given month.
16 Q. So 10 to 50 of their 250 to 300 claims
17 would be on that list?
18 A. Yes.
19     MR. COLEMAN: Let's take a quick
20 break.
21     MR. SHEA: Sure.
22     VIDEOTAPE SPECIALIST: Now going off
23 the record, the time is 3:34 p.m. It's the end
24 of tape number one.