**1**

```
1                          Volume: 1
2                          Pages: 1-248
3                          Exhibits: 1-4
4
5              SUPERIOR COURT OF CALIFORNIA
6                 COUNTY OF SAN FRANCISCO
7    Case No. CGC-17-556478
8    - - - - - - - - - - - - - - - - - - - - - - - - - x
9    VINCENT K. SIEFE, DDS,
10              Plaintiff,
11        v.
12   UNUM GROUP; THE PAUL REVERE LIFE INSURANCE COMPANY;
13   DAVE JONES AS COMMISSIONER OF INSURANCE; and
14   DOES 1-20, inclusive,
15              Defendants.
16   - - - - - - - - - - - - - - - - - - - - - - - - - x
17                     CONFIDENTIAL
18       VIDEOTAPED DEPOSITION OF ADAM P. STIMSON
19                    July 26, 2017
20               9:07 a.m. to 5:21 p.m.
21                   BEECHWOOD HOTEL
22                 363 Plantation Street
23               Worcester, Massachusetts
24
25       Reporter: Marianne R. Wharram, CSR/RPR/CRR
```

**3**

```
1                    I N D E X
2    DEPONENT    DIRECT  CROSS  REDIRECT  RECROSS
3    ADAM P. STIMSON
4    (BY MR. COLEMAN)    7
5    (BY MR. MAGUIRE)
6
7                  E X H I B I T S
8    NO.         DESCRIPTION                 PAGE
9    Exhibit 1   12-page Plaintiff's Notice of      7
10               Taking Deposition of Defendants
11               UNUM Group's and The Paul Revere
12               Life Insurance Company's Person(s)
13               Most Knowledgeable and Employees
14   Exhibit 2   2-page Performance Plan 2014       17
15               LTD/IDI Benefits Operations Director
16   Exhibit 3   3-page Vincent Siefe, DDS, Medical 129
17               Treatment from Unum Claim File
18               (By Date)
19   Exhibit 4   1-page Chart, 2013-2016;          178
20               Treatment Weeks
21
22
23
24   *Original exhibits retained by Mr. Coleman.
25
```

**2**

```
1    A P P E A R A N C E S
2
3            PILLSBURY & COLEMAN, LLP
4            (BY TERRENCE J. COLEMAN, ESQ.)
5            The Transamerica Pyramid
6            600 Montgomery Street, 31st Floor
7            San Francisco, CA  94111
8            (415) 433-8000
9            tcoleman@pillsburycoleman.com
10           Counsel for the Plaintiff
11
12           BURKE, WILLIAMS & SORENSEN, LLP
13           (BY DANIEL W. MAGUIRE, ESQ.)
14           73929 Larrea Street, Suite 4A
15           Palm Desert, CA  92260
16           (760) 776-5600
17           dmaguire@bwslaw.com
18           Counsel for the Defendants
19
20   ALSO PRESENT:
21       DONALD SAPALA, ESQ., UNUM Group
22       CRYSTAL STRAWBRIDGE, Videographer
23
24
25
```

**4**

```
1              P R O C E E D I N G S
2        VIDEOGRAPHER:  Here begins disk number
3    one in the videotaped deposition of Adam Stimson in
4    the matter of Vincent K. Siefe, DDS, v. UNUM Group;
5    The Paul Revere Life Insurance Company; et al., in
6    the Superior Court of California, County of
7    San Francisco, Case Number CGC-17-556478.
8        Today's date is July 26, 2017, and the
9    time on the video monitor is 9:07.  The
10   videographer today is Crystal Strawbridge,
11   representing Planet Depos.  This video deposition
12   is being -- taking place at 363 Plantation Street,
13   Worcester, Massachusetts.
14       Would counsel please voice identify
15   themselves and state whom they represent?
16       MR. COLEMAN:  I'm Terry Coleman.  I
17   represent Dr. Siefe.
18       MR. MAGUIRE:  Dan Maguire for
19   Defendants UNUM Group, Paul Revere Life Insurance
20   Company.
21       MR. SAPALA:  Donald Sapala with UNUM.
22       VIDEOGRAPHER:  The court reporter today
23   is Marianne Wharram, representing Planet Depos.
24   Would the reporter please swear in the witness?
25           ADAM P. STIMSON,
```

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 1 of 8   PageID #: 1166

25

1  sometimes occurred during the first week of a -- in
2  a given month.
3      Q.  I'm talking about meetings between you and
4  Mr. Peter individually.  Mr. Peter testified that
5  he would meet with his directors one-on-one at the
6  beginning of each month.  Is that your recollection
7  also?
8      A.  Generally speaking, I think that's for the
9  most part accurate.  Again, there may have been
10 times where those meetings didn't occur on the
11 first week of the month for one reason or another.
12     Q.  And Mr. Peter, when you would meet with him
13 at the beginning of the month, he would communicate
14 recovery expectations to you for that month; is
15 that right?
16     A.  That was not the terminology, necessarily,
17 that was used.  There were discussions of -- of
18 expectations for that, that month.
19     Q.  He would give you a dollar amount of
20 expectation; is that right?
21     A.  There was a -- what I would call
22 approximate values that are associated with any
23 given claim, and I think there was an approximate
24 value for -- for my team that I was made aware of.
25     Q.  What would he say to you in that regard?

26

1  Let me withdraw that.  What did he say to you in
2  that regard?
3      A.  In regard to --
4      Q.  Well, you just told me that there was an
5  approximate value for my team that I was a made --
6  that I was made aware of.  My question is what did
7  he say to you in that regard.
8      A.  He would give me a -- a figure, a dollar
9  figure and what we would call a claim count figure.
10     Q.  What would he say when he gave you the
11 dollar figure?
12     A.  I'm not sure I can recall specifically.  It
13 was in terms of what the monthly -- what my monthly
14 dollar amount would be for that month.
15     Q.  What would he say; for example, Adam, the
16 dollar amount for your team this month is
17 $10 million?
18         MR. MAGUIRE:  Objection.  Vague.
19     Q.  (BY MR. COLEMAN)  Would he say something
20 like that?
21     A.  He would say that, yeah, the dollar amount
22 for your team for this month is any given -- you
23 know, a number.
24     Q.  When he was telling you the dollar amount,
25 was he reading from something?

27

1      A.  He -- not always.  He may have been.
2      Q.  Well, he wasn't -- was he giving you a
3  number just out of thin air?
4          MR. MAGUIRE:  Objection.  Speculation.
5      A.  I'm not sure I was always aware of the --
6  what he was -- where the number was derived from
7  when he was giving it to me.
8      Q.  (BY MR. COLEMAN)  Did you ever see him
9  reading from a document when he was giving you the
10 dollar amount?
11     A.  Yes.
12     Q.  What was he reading from?  Could you see
13 the document?
14     A.  As I recall, they were essentially
15 handwritten notes.
16     Q.  What was the color of the paper?
17     A.  From the notes that I was just referring
18 to?
19     Q.  Yes.
20     A.  That would have -- it would have been a
21 piece of notebook paper, so essentially, it would
22 have been either white or yellow.
23     Q.  And when you say notebook paper, are you
24 referring to a tablet that has perforation up at
25 the top that you could tear out, or a spiral ring

28

1  notebook, or a binder that has -- you know, a
2  three-ring binder?  What -- what are you referring
3  to?
4      A.  As I recall, it was a loose piece of paper
5  that was -- so essentially torn from a tablet-like
6  notebook like the one that you're using.
7      Q.  One that had lines?
8      A.  Yes.  A typical piece of -- of what I would
9  say a typical piece of notebook paper.
10     Q.  Was there a typical range of the dollar
11 amounts that you were given every month?
12     A.  I mean, there were -- there were different
13 numbers each month.  I guess you could consider
14 those to be a range from the lowest to the highest,
15 but I'm not sure I'd call it a typical range.
16     Q.  So what were the amounts that you were
17 given?
18     A.  I'm not sure I can recall specifically what
19 the amounts were.
20     Q.  So generally, what were the amount ranges
21 that you were given?
22     A.  I'm just trying to recall what the
23 approximate numbers would be.  What were -- with
24 regard to the values figures that we were speaking
25 about?  Is that what your -- what your question is?

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 2 of 8   PageID #: 1167

29

1    Q. Yeah, what we've been talking about for the
2 last 15 minutes.
3    A. I would say it was approximately between 1
4 to $2 million.
5    Q. And it was different every month?
6    A. Yes.
7    Q. So did you write that number down so that
8 you would have it?
9    A. I would sometimes write it down, yes.
10    Q. Sometimes, you wouldn't write it down?
11    A. Correct.
12    Q. Why wouldn't you write it down?
13    A. I can't recall the specifics of the
14 situation where I wouldn't write it down, but
15 I'm -- I'm sure there were times when I didn't
16 write it down, either didn't have a pen or didn't
17 write it down.
18    Q. Did -- did you ever receive this number
19 communicated to you in any format other than word
20 of mouth?
21    A. Not that I can recall, no.
22    Q. Did you have any discussions with Mr. Peter
23 about how he arrived at the particular number that
24 you were being given?
25    A. Did I have any particular discussions with

30

1 him about that?
2    Q. Yes.
3    A. Not that I recall.
4    Q. What did the number represent? Say if
5 Mr. Peter told you, you know, in October of 2016
6 that your number is $2 million this month, what did
7 that mean to you?
8    A. What it meant to me was that that was the
9 total value of claims that would be resolving for
10 that particular month.
11    Q. And when you mean claims resolving, that
12 means that the value of the claims that would no
13 longer be -- be paid at the end of the month? Is
14 that right?
15    A. When I say resolved, what I mean is that
16 the claims would no longer be paid for that month,
17 yes; or actually, excuse me, would no longer be
18 paid after that, after that particular month.
19    Q. And so in order to meet, for example, a
20 $2 million number as Mr. Peter would -- would have
21 communicated to you, then your team would have had
22 to have a certain number of claims stop being paid
23 by the end of the month that would aggregate to
24 $2 million worth of claims, right?
25        MR. MAGUIRE: Objection. Lacks

31

1 foundation. Argumentative.
2    A. The monthly figure would be the sum of the
3 claims that resolved for that particular month.
4    Q. (BY MR. COLEMAN) And the number is derived
5 from the reserves that are associated on the
6 claims; is that right?
7        MR. MAGUIRE: Objection. Foundation.
8 Calls for speculation.
9    A. I -- I'm not sure where the number was
10 directly derived from.
11    Q. (BY MR. COLEMAN) Well, you do know what a
12 reserve is, don't you?
13    A. I've heard the term reserve.
14    Q. Well, how would you know whether or not
15 your team would be close to achieving the number if
16 you didn't understand what it represented?
17        MR. MAGUIRE: Objection. Foundation.
18 Argumentative.
19    A. I'm sorry. Can you repeat the question?
20    Q. (BY MR. COLEMAN) Yeah. So if Mr. Peter
21 gives you a number of $2 million, right, at the
22 beginning of October 2016, as you're approaching
23 the end of that month, how would you know
24 whether -- where your team was in relation to
25 meeting that number if you didn't have a detailed

32

1 understanding of how that dollar figure was
2 computed?
3    A. There would be an associated value with a
4 particular claim if it resolved during that month.
5    Q. So each claim that your team was
6 responsible for handling would have an associated
7 dollar figure attached to it?
8    A. I'm not sure that each claim has one. I'm
9 not sure.
10    Q. So how would you know whether or not you'd
11 be meeting that number towards the end of the
12 month?
13    A. I would -- I could ask Mr. Peter.
14    Q. Don't you have access to the -- what you
15 called the associated dollar figure attached to the
16 claims that your team was handling?
17    A. No.
18    Q. You never did?
19    A. No.
20    Q. Did you have discussions with Mr. Peter
21 about where you -- where your team was over the
22 course of the month in relation to meeting or not
23 meeting the dollar figure expectation?
24    A. Yes.
25    Q. How often would you discuss that?

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 3 of 8   PageID #: 1168

33

1   A.  Maybe multiple times over the course of a
2   given month.
3       Q.  Did he impress upon you the importance of
4   meeting the number?
5       A.  It was one of -- I guess I would call it
6   one of my responsibilities to make sure that the
7   claims were being managed appropriately and that
8   decisions were being completed in a timely manner.
9       Q.  My question was did he impress upon you the
10  importance of meeting the number.
11      A.  I guess I'm not sure what you mean by
12  importance.
13      Q.  I'm sorry.  What's unclear about my
14  question?  I want to make sure that I can phrase it
15  for you.
16      A.  We had discussions -- you know, we
17  generally had discussions throughout the month
18  about, you know, the -- the value of the claims
19  that had resolved for my team in comparison to what
20  that number was, you know, at -- approximately at
21  the beginning of the month, so we had regular dis--
22  you know, we had multiple discussions over the
23  course of the month.
24      Q.  I take it that since your boss was having
25  those regular discussions with you in that regard,

34

1   you must have felt it was important to meet the
2   number each and every month?
3       A.  It was one of the objectives for -- one of
4   the objectives for me over the course of a given
5   month.
6       Q.  Given that it was one of the objectives for
7   you, I take it that you felt it was important to
8   meet the number each and every month?
9       A.  It was -- it was important to -- I guess I
10  would say it was important to try to meet all of
11  the objectives, and if that was one of the
12  objectives, then yes, I guess I would consider that
13  important.
14      Q.  This important objective, is it written out
15  in any -- in any place in your -- you mentioned the
16  performance evaluations.  Is this important
17  objective -- that is, meeting the number -- is that
18  set forth in any written document that you're aware
19  of?
20      A.  I'm not sure.
21      Q.  What did you do with the numbers that you
22  wrote down on your own piece of paper when
23  Mr. Peter communicated it, communicated this to
24  you?
25      A.  I would keep it securely at my work space

35

1   or my cubicle.
2       Q.  How would you go about keeping it securely?
3       A.  It was typically written down on a piece of
4   paper, typically a sticky note, and it would be in
5   a locked drawer in my cubicle.
6       Q.  You're referring to a Post-it note?
7       A.  Yes.
8       Q.  Did you have a general size of a Post-it
9   note that you would write the number on?
10      A.  It was usually a square.  I don't know if
11  that is two-by-two.  It was bigger than the one
12  you're holding right now, typically.  There are
13  various sizes of Post-it notes.
14      Q.  So are you referring to a two-inch by
15  two-inch Post-it note?
16      A.  I believe that's the size.  That's
17  typically I guess what the stock Post-it note is in
18  our office, or the ones that I utilized.
19      Q.  So the Post-it notes that you utilized at
20  your office, I've seen some Post-it notes that
21  have, you know, like a company's name or logo on
22  them.  Are those -- is there a company name or logo
23  on the Post-it notes that you would use to write
24  the dollar figure that you had to achieve?
25      A.  No.

36

1       Q.  It was just a blank Post-it note?
2       A.  It was blank, yes.
3       Q.  And then, when you put it in your locked
4   drawer, then what did you do with it after that?
5       A.  I'm not sure what you mean.
6       Q.  Well, you said that you would put it away
7   securely in your cubicle in a drawer, right, the
8   Post-it note?
9       A.  Yes.
10      Q.  And is that a locked drawer?
11      A.  Locked, yes.
12      Q.  And then -- and then what would happen to
13  the note?  What would you do with it after that
14  point?  Do you have a drawer full of sticky notes?
15      A.  Not specifically with those -- with those
16  numbers on it.  I would -- I would have access to
17  it throughout the course of the month.  I, you
18  know, have the key for that locked drawer.  I may
19  refer to it over the course of the month, and then
20  at the end of the month, I would dispose of it.
21      Q.  Why would you refer to it if you had no
22  reference point from which you could determine
23  whether you were anywhere near meeting or not
24  meeting that number?  What purpose would you have
25  for that -- for that Post-it note?

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 4 of 8   PageID #: 1169

37

1      MR. MAGUIRE:  Objection.  Lacks
2  foundation.
3      A.  When you say no reference, I think I had
4  previously alluded to periodic check-ins with
5  Mr. Peter, so that's what I would consider to be a
6  reference point.
7      Q.  (BY MR. COLEMAN)  All right, so then at the
8  end of the month, what would you do?  Now at the
9  next month, you're given a new number, right?
10     A.  Essentially, yes.
11     Q.  All right, so the old number that you had,
12  the sticky note that you had in your locked drawer
13  that you keep pulling out and looking at, now you
14  have a new number, all right, so you have a new
15  Post-it note for that month?
16     MR. MAGUIRE:  Object to the preface.
17     A.  Essentially, yes.
18     Q.  (BY MR. COLEMAN)  All right, so then you go
19  back to your cubicle and you open up the locked
20  drawer and you put the Post-it note in the drawer,
21  right?
22     A.  Essentially, yes.
23     Q.  And what do you do with the old Post-it
24  note?
25     A.  Dispose of it.

38

1      Q.  All right.  How do you dispose of it?
2      A.  Throw it in the recycling bin or in the
3  trash.
4      Q.  Crumple it up and throw it away?
5      A.  Yes.
6      Q.  Now you've got a new Post-it note for that
7  month, right?
8      A.  Yes.
9      Q.  And then this process would continue each
10  and every month when you were reporting to
11  Mr. Peter?
12     A.  Essentially, yes.
13     Q.  Did you ever exceed your number?
14     A.  Yes.
15     Q.  Did Mr. Peter congratulate you for doing
16  so?
17     A.  I was made aware of it.  I wouldn't call it
18  a congratulations, no.
19     Q.  Well, was he pleased?
20     MR. MAGUIRE:  Objection.  Speculation.
21     A.  I'm not sure I could comment on whether he
22  was pleased or not.
23     Q.  (BY MR. COLEMAN)  Were you pleased?
24     A.  I was -- again, meeting one of the
25  objectives of my role, yes, I was pleased to be

39

1  able to meet or exceed one of those objectives.
2      Q.  All right.  It was pleasing to you because
3  you felt that it was pleasing to the company
4  because it was one of your performance objectives?
5      MR. MAGUIRE:  Objection.
6  Argumentative.  Lacks foundation.
7      A.  It was pleasing to me personally because it
8  was one of the -- one of the -- one of my
9  objectives for that month amongst others that I was
10  able to meet or exceed that particular objective.
11     Q.  (BY MR. COLEMAN)  So to a certain extent,
12  you gain satisfaction from denying claims?
13     MR. MAGUIRE:  Objection.
14  Argumentative.
15     A.  No, I wouldn't say that.  No.
16     Q.  (BY MR. COLEMAN)  Yet exceeding the
17  performance objective of achieving a dollar figure
18  of claim recoveries pleased you?
19     MR. MAGUIRE:  Objection.  Lacks
20  foundation.
21     A.  That number is not -- not an aggregate
22  amount of claims that are denied, so I don't -- I
23  wouldn't agree to that statement, no.
24     Q.  (BY MR. COLEMAN)  Well, how are the ways
25  that a claim can resolve?

40

1      A.  There are multiple ways.
2      Q.  Somebody goes back to work, right?
3      A.  Correct.
4      Q.  Somebody dies?
5      A.  I'm not -- I'm not completely sure how that
6  is sort of categorized, if you will.  I'm not sure
7  that that's considered a claim resolution, but that
8  would be the end of someone's claim if they were to
9  die, yes.
10     Q.  Somebody reaches the maximum benefit
11  period?
12     A.  Again, I'm not -- I'm not sure if that's
13  considered a claims resolution, but that would be
14  the end of a claim if it reaches the maximum
15  benefit period.
16     Q.  Or your company tells the insured that
17  they're either going to stop making a disability
18  benefit payment or they're not going to make a
19  benefit payment at all, right?
20     A.  With regard to liability decisions, there
21  are claims that are -- that the determination is
22  made that it's not compensable, and that can be
23  made on a claim that's not -- that's never been
24  paid or a claim that was in a paid status.
25     Q.  Now, Dr. Siefe, he never received a single

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 5 of 8   PageID #: 1170

### 69

1    A. I don't believe he was entitled. If he
2  was -- and I'm not sure what you mean by entitled,
3  but we made -- we didn't -- we never made the
4  determination, or Jennifer never made the
5  recommendation to provide a reservation of rights
6  payment on this claim.
7    Q. (BY MR. COLEMAN) Was she given guidance as
8  to when to consider making a reservation of rights
9  payment?
10       MR. MAGUIRE: Objection. Lacks
11 foundation.
12    A. As part of her role in the -- as a DBS,
13 there is guidance around the use of -- and the --
14 around the use of reservations of rights.
15    Q. (BY MR. COLEMAN) Is one of the
16 circumstances under which your company considers to
17 make a reservation of rights payment the length of
18 time that it's taken to make a liability
19 determination?
20    A. Yes.
21    Q. So did that circumstance here indicate that
22 the company should consider on Dr. Siefe's claim
23 making a reservation of rights payment?
24    A. Not that -- I don't recall having a
25 conversation or -- or -- with Jennifer or anyone

### 70

1  about the reservation of rights payment on this
2  claim.
3    Q. Having reviewed the file, is that something
4  that you would have liked to have seen done?
5    A. No.
6    Q. So why would you have indicated paid likely
7  here, then?
8    A. I don't recall.
9    Q. Was there any circumstance that -- under
10 which you could have anticipated Dr. Siefe being
11 entitled to payment of benefits? Let me withdraw
12 that. That's a bad question.
13       What are the other possibilities there
14 for inventory status name other than paid likely?
15 What are they on the drop-down menu?
16    A. To the best that I can recall, there are
17 several, including I believe they were named
18 unpaid, possible unpaid, likely, paid possible,
19 paid likely. And I believe there were others, but
20 I don't -- there may be others. I can't recall
21 what they may be.
22    Q. All right, so I have down four
23 possibilities on that drop-down; paid possible,
24 paid likely, unpaid possible, and unpaid likely.
25 Are those the possibilities?

### 71

1    A. Those are the four that I -- that I named
2  that I can recall.
3    Q. What would cause you to indicate a
4  possibility as opposed to a likely? Let me
5  withdraw that.
6       Does having -- choosing the drop-down
7  of paid possible as opposed to paid likely, would
8  the reason why you would choose that one over the
9  other be because you were less confident in -- in
10 that status outcome?
11    A. I don't recall specifically how I would use
12 the particular options. I'm not sure if I was
13 more -- you know, that it was more common for me to
14 use possible over likely, and I can't recall in
15 this situation.
16    Q. But as the director who has the
17 responsibility of choosing one or the other, did
18 you have a practice of using possible if you were
19 less confident in that outcome as opposed to
20 likely?
21    A. I may. Possible is a -- is a lessor
22 descriptor than likely, I would say.
23    Q. All right. Was there anything about
24 Dr. Siefe's claim at that time that indicated to
25 you that he was likely entitled to benefits?

### 72

1    A. Not that I can recall at that time.
2    Q. So why did you choose paid likely as
3  opposed to unpaid likely?
4    A. I don't know.
5    Q. Did you have separate performance
6  objectives for paid recoveries as opposed to unpaid
7  recoveries?
8    A. I'm not sure what you mean by performance
9  objectives.
10    Q. Well, Mr. Peter communicated dollar figure
11 expectations to you for recoveries, correct? You
12 told me that he sat you down every month and --
13 most months and gave you a dollar figure range of
14 1 to $2 million, right?
15    A. Generally speaking, yes.
16    Q. And were you given any recovery
17 expectations for various categories; that is,
18 either unpaid recovery or paid recovery?
19    A. They're categorized differently. Yes.
20    Q. So each month, were you given expectations
21 for the dollar amount of paid recoveries?
22    A. As I understood it, the dollar amount that
23 was given was for -- was the summation, for lack of
24 a better term, of claim resolutions where there was
25 benefits paid.

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 6 of 8   PageID #: 1171

**73**

1    Q. All right, so just to use a -- an example,
2  if Mr. Peter -- let's assume he communicates a
3  $2 million recovery number to you. It was your
4  understanding that that $2 million number comprised
5  a sum of paid recoveries as well as unpaid
6  recoveries?
7    **A. No. It was the sum of -- I guess it would**
8  **be the sum of paid and unpaid, but the addition of**
9  **the unpaid would be zero, as I understood it.**
10   Q. So in order to meet your number, you would
11  have had to have made a one-time payment of
12  benefits?
13   **A. I don't understand your question.**
14   Q. Well, let's assume that you have a
15  $2 million number that Mr. Peter has given to you,
16  all right? Okay?
17   **A. Yes.**
18   Q. And all your recoveries for that next month
19  are unpaid recoveries; that is, the company just --
20  you, your team, decides that -- that on its block
21  of claims that everyone is going to get no benefits
22  that month. Okay? Are you with me so far?
23   **A. For those particular -- those were the**
24  **decisions that were made on those particular**
25  **claims?**

**74**

1    Q. Yes.
2    **A. Yes.**
3    Q. All right. It would be your understanding
4  that you wouldn't have met your recovery number
5  expectation, because those contributed zero?
6    **A. Those particular claims, I think that would**
7  **be correct.**
8    Q. So in order to meet your number, it was
9  your understanding that you had to make a one-time
10  payment of benefits?
11   **A. Again, I'm not -- I'm not sure what your --**
12  **what the question is.**
13   Q. Well, it's your -- my question is your
14  understanding of how the math worked. You were
15  given a $2 million number by Mr. Peter, okay?
16   **A. Yes.**
17   Q. The only way that you could achieve that
18  number for that next month would be to have a sum
19  of paid recoveries that equalled $2 million. Is
20  that right?
21   **A. I guess I would answer in saying that**
22  **the -- the sum of the approximate values of paid --**
23  **of claims that were closed where a payment was**
24  **made. It's not necessarily a one-time payment. I**
25  **guess that's where I was getting confused. Claims**

**75**

1  **that I would call paid claims.**
2    Q. Okay, either in an ongoing paid status or a
3  single payment, right?
4    **A. That were -- that benefits were paid.**
5      MR. COLEMAN: All right. Let's take a
6  break.
7      MR. MAGUIRE: Okay.
8      VIDEOGRAPHER: We're going off the
9  record at 11:13.
10     (Off the record.)
11     (Recess taken from 11:13 to 11:24.)
12     VIDEOGRAPHER: We are back on the
13  record at 11:24.
14   Q. (BY MR. COLEMAN) Mr. Stimson, what was
15  your role with respect to the handling of
16  Dr. Siefe's claim?
17   **A. I was the director for the DBS.**
18   Q. Were you the individual who had the most
19  experience responsible for the handling of the
20  claim?
21   **A. I'm not sure I understand your question.**
22  **There are others involved that have -- I'm not sure**
23  **what you mean by experience.**
24   Q. With respect to claims handling. You were
25  the individual on behalf of the company that had

**76**

1  the most seniority and experience with respect to
2  claim -- claims administration that was responsible
3  for the claim, correct?
4    **A. Well, there is -- there is -- there are**
5  **other roles. I'm not sure what their experience**
6  **levels are. I think there may be, I guess, longer**
7  **than mine.**
8    Q. Well, you're referring to the clinical
9  consultants on the file?
10   **A. Right. I mean, there is other people that**
11  **are involved in the claim.**
12   Q. They don't make the determination whether
13  to pay or not, though, right?
14   **A. The clinical consultants, certainly not,**
15  **no.**
16   Q. Who ultimately had the de-- the
17  responsibility on behalf of the company to make the
18  decision whether or not Dr. Siefe received his
19  benefits?
20   **A. The process is that the DBS makes the**
21  **recommendation for the liability decision. In this**
22  **case, that then was for -- she was recommending**
23  **that benefits not be paid. I reviewed the**
24  **recommendation; at that time, agreed; and there was**
25  **a QCC review done as well subsequent to my review.**

245

1 than 90 days; is that correct?
2    Q.  Yeah.
3    A.  Those are paid claims.  Those are claims
4 that have already had at least an initial payment
5 made and 90 days has lapsed from one payment to the
6 next.
7    Q.  Oh, okay.
8    A.  So those are not for open undecided claims.
9    Q.  All right, so where is the expectation for
10 the open undecideds?
11   A.  Do you have this?  It's the percentage, I
12 believe, is the second -- second row.
13   Q.  Oh, percentage undecided --
14   A.  I think it says 90 --
15   Q.  -- greater than 90 days.
16   A.  Correct.
17   Q.  Okay.  I see.  And that's less than
18 16 percent?
19   A.  Correct.
20   Q.  You want to -- you want to have at least
21 84 percent of her claims being decided within that
22 90-day time period?
23   A.  I think that's the general guidance or the
24 goal, yes.
25       MR. COLEMAN:  Okay.  Let's see.  We

246

1 have a stipulation, I believe, as to authenticity
2 of business records exception to the hearsay rule
3 for all documents produced by the defendants,
4 correct?
5       MR. MAGUIRE:  Correct.
6       MR. COLEMAN:  Okay.  I don't have
7 anything further.
8       VIDEOGRAPHER:  We are going off the
9 record at 5:21.
10       (Off the video record.)
11       COURT REPORTER:  Would you like to
12 order the transcript, Mr. Maguire?
13       MR. MAGUIRE:  Yes, please.
14       COURT REPORTER:  And Mr. Coleman?
15       MR. COLEMAN:  Yes.  Thank you.
16       (Off the record.)
17       (Whereupon the deposition was adjourned
18 at 5:21 p.m.)
19
20
21
22
23
24
25

247

1         ACKNOWLEDGMENT OF DEPONENT
2       I, ADAM P. STIMSON, do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony, and the same is a true, correct
5 and complete transcription of the testimony given by
6 me and any corrections appear on the attached Errata
7 sheet signed by me.
8
9 _____   _____
10   (DATE)            (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

248

1 COMMONWEALTH OF MASSACHUSETTS
2 MIDDLESEX, ss.
3
4      I, Marianne R. Wharram, Certified Shorthand
5 Reporter, Registered Professional Reporter, Certified
6 Realtime Reporter, and Notary Public in and for the
7 Commonwealth of Massachusetts, do hereby certify
8 that ADAM P. STIMSON, the witness whose deposition
9 is hereinbefore set forth, was duly identified and
10 sworn by me and that such deposition is a true
11 record of the testimony given by the witness.
12      I further certify that I am neither related to
13 or employed by any of the parties in this action,
14 nor am I financially interested in the outcome of
15 this action.
16      In witness hereof, I have hereunto set my hand
17 this seventh day of August, 2017.
18
19
20 _____
21 Marianne R. Wharram, CSR/RPR/CRR
22 CSR No. 1426S96, Registered
23 Professional and Certified
24 Realtime Reporter, Notary Public
25 Commission expires 7/20/2023

Case 1:17-cv-00220-HSM-CHS   Document 49-9   Filed 06/27/18   Page 8 of 8   PageID #: 1173